UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SHAWN LAMONT BROWN, | Case No.   1:23-cv-00221-KES-HBK (HC) |
| Petitioner, | FINDINGS AND RECOMMENDATIONS TO DENY PETITION FOR WRIT OF HABEAS CORPUS AND DECLINE TO ISSUE CERTIFICATE OF APPEALABILITY [1] |
| v. | |
| JEFF MACOMBER, | FOURTEEN-DAY OBJECTION PERIOD |
| Respondent. | |

## I.   STATUS

Petitioner Shawn Lamont Brown ("Petitioner" or "Brown"), a state prisoner, is proceeding through counsel on his petition for writ of habeas corpus filed under 28 U. S.C. § 2254 on February 14, 2023.  (Doc. No. 1, "Petition").  Petitioner challenges his Fresno County state conviction after a jury trial for first degree murder with sentencing enhancements for the use of a firearm.  (Case No. F15904751).  (Doc. 11-2 at 2327; *see* Doc. No. 11-1 at 837-38).[2]  The Fresno County Superior Court sentenced Petitioner to an aggregate term of 50 years to life in prison. (Doc. No. 11-2 at 2327; *see id.* at 118-19).

---

[1] This matter was referred to the undersigned pursuant to 28 U.S.C. § 636(b)(1)(B) and Local Rule 302 (E.D. Cal. 2025).

[2] All citations to the pleadings and record are to the page number as it appears on the Case Management and Electronic Case Filing ("CM/ECF") system.

1

On appeal, the Fifth Appellate District Court amended the judgment as to restitution but otherwise affirmed Petitioner's conviction.  (Case No. F077143).  (Doc. No. 11-2 at 2396-97).  On November 23, 2021, the California Supreme Court summarily denied Brown's petition for review.  (Case No. S271259).  (*Id.* at 2586).

The instant federal Petition presents the following (restated) grounds for relief:

> (1) There was insufficient evidence to support the first degree murder conviction.
>
> (2) The trial court improperly instructed jurors they could determine the identity of the killer based on Petitioner's "statements alone," relieving the prosecution of its burden to prove beyond a reasonable doubt that Petitioner killed the victim.
>
> (3) The trial court failed to instruct the jury on a defense theory of manslaughter that was fully supported by the evidence.
>
> (4) The combination of each of the errors warrants relief.

(*See* Doc. No. 1 at 3-10).  Respondent filed an Answer (Doc. No. 12), arguing Petitioner was not entitled to relief on any of his grounds, and lodged the state court record in support (Doc. Nos. 11, 11-1, 11-2).  Petitioner filed a traverse.  (Doc. No. 15).  This matter is deemed submitted on the record before the Court.  After careful review of the record and applicable law, the undersigned recommends the district court deny Brown relief on his Petition and decline to issue a certificate of appealability.

## II.    GOVERNING LEGAL PRINCIPLES

### A.    Evidentiary Hearing

In deciding whether to grant an evidentiary hearing, a federal court must consider whether such a hearing could enable an applicant to prove the petition's factual allegations, which, if true, would entitle the applicant to federal habeas relief."  *Schriro v. Landrigan*, 550 U.S. 465, 474 (2007).  "It follows that if the record refutes the applicant's factual allegations or otherwise precludes habeas relief, a district court is not required to hold an evidentiary hearing."  *Id.*  Here, the state courts adjudicated Petitioner's claims for relief on the merits.  This Court finds that the pertinent facts of this case are fully developed in the record before the Court; thus, no evidentiary hearing is required.  *Cullen v. Pinholster*, 563 U.S. 170 (2011).

2

### B.      ADEPA General Principles

A federal court's statutory authority to issue habeas corpus relief for persons in state custody is set forth in 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA).  AEDPA requires a state prisoner seeking federal habeas relief to first "exhaus[t] the remedies available in the courts of the State."  28 U.S.C. § 2254(b)(1)(A).  If the state courts do not adjudicate the prisoner's federal claim "on the merits," a *de novo* standard of review applies in the federal habeas proceeding; if the state courts do adjudicate the claim on the merits, then AEDPA mandates a deferential, rather than *de novo*, review.  *Kernan v. Hinojosa*, 136 S. Ct. 1603, 1604 (2016).  This deferential standard, set forth in § 2254(d), permits relief on a claim adjudicated on the merits, but only if the adjudication:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).  This standard is both mandatory and intentionally difficult to satisfy.  *Sexton v. Beaudreaux*, 138 S. Ct. 2555, 2558 (2018); *White v. Woodall*, 572 U.S. 415, 419 (2014).

"Clearly established federal law" consists of the governing legal principles in the decisions of the United States Supreme Court when the state court issued its decision.  *White*, 572 U.S. at 419.  Habeas relief is appropriate only if the state court decision was "contrary to, or an unreasonable application of," that federal law.  28 U.S.C. § 2254(d)(1).  A decision is "contrary to" clearly established federal law if the state court either: (1) applied a rule that contradicts the governing law set forth by Supreme Court case law; or (2) reached a different result from the Supreme Court when faced with materially indistinguishable facts.  *Mitchell v. Esparza*, 540 U.S. 12, 16 (2003).

A state court decision involves an "unreasonable application" of the Supreme Court's precedents if the state court correctly identifies the governing legal principle, but applies it to the facts of the petitioner's case in an objectively unreasonable manner, *Brown v. Payton*, 544 U.S. 133, 134 (2005), or "if the state court either unreasonably extends a legal principle from

1   [Supreme Court] precedent to a new context where it should not apply or unreasonably refuses to

2   extend that principle to a new context where it should apply." *Williams v. Taylor*, 529 U.S. 362,

3   407, (2000). "A state court's determination that a claim lacks merit precludes federal habeas

4   relief so long as fair-minded jurists could disagree on the correctness of the state court's

5   decision." *Harrington v. Richter*, 562 U.S. 86, 101 (2011). The petitioner must show that the

6   state court decision "was so lacking in justification that there was an error well understood and

7   comprehended in existing law beyond any possibility for fairminded disagreement." *Id*. at 103.

8          When reviewing a claim under § 2254(d), any "determination of a factual issue made by a

9   State court shall be presumed to be correct[,]" and the petitioner bears "the burden of rebutting

10  the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1); *Burt*

11  *v. Titlow*, 571 U.S. 12, 18 (2013) ("[A] state-court factual determination is not unreasonable

12  merely because the federal habeas court would have reached a different conclusion in the first

13  instance.") (quoting *Wood v. Allen*, 558 U.S. 290, 293 (2010)).

14         Even if a petitioner meets AEDPA's "difficult" standard, he must still show that any

15  constitutional error had a "substantial and injurious effect or influence" on the verdict. *Brecht v.*

16  *Abrahamson*, 507 U.S. 619, 637 (1993). As the Supreme Court explained, while the passage of

17  AEDPA "announced certain new conditions to [habeas] relief," it didn't eliminate *Brecht's* actual-

18  prejudice requirement. *Brown v. Davenport*, 596 U.S. 118, 134 (2022). In other words, a habeas

19  petitioner must satisfy *Brecht*, even if AEDPA applies. *See id.* at 138 ("[O]ur equitable

20  precedents remain applicable 'whether or not' AEDPA applies.") (*citing Fry v. Pliler*, 551 U.S.

21  112, 121 (2007)). In short, a "federal court must deny relief to a state habeas petitioner who fails

22  to satisfy either [*Brecht*] or AEDPA. But to grant relief, a court must find that the petition has

23  cleared both tests." *Id*. at 134.

24         As discussed *supra*, for the deferential § 2254(d) standard to apply there must have been

25  an "adjudication on the merits" in state court. An adjudication on the merits does not require that

26  there be an opinion from the state court explaining the state court's reasoning. *Richter*, 562 U.S.

27  at 98. "When a federal claim has been presented to a state court and the state court has denied

28  relief, it may be presumed that the state court adjudicated the claim on the merits in the absence

4

of any indication or state-law procedural principles to the contrary." *Id*. at 99. "The presumption may be overcome when there is reason to think some other explanation for the state court's decision is more likely." *Id*. at 99-100. This presumption applies whether the state court fails to discuss all the claims or discusses some claims but not others. *Johnson v. Williams*, 568 U.S. 289, 293, 298-301 (2013).

While such a decision is an "adjudication on the merits," the federal habeas court must still determine the state court's reasons for its decision in order to apply the deferential standard. When the relevant state-court decision on the merits is not accompanied by its reasons,

> the federal court should "look through" the unexplained decision to the last related state-court decision that does provide a relevant rationale. It should then presume that the unexplained decision adopted the same reasoning. But the State may rebut the presumption by showing that the unexplained affirmance relied or most likely did rely on different grounds than the lower state court's decision, such as alternative grounds for affirmance that were briefed or argued to the state supreme court or obvious in the record it reviewed.

*Wilson v. Sellers*, 138 S. Ct. 1188, 1192 (2018). The federal court "looks through" the silent state court decision "for a specific and narrow purpose—to identify the grounds for the higher court's decision, as AEDPA directs us to do." *Id*. at 1196.

## III.    RELEVANT FACTUAL BACKGROUND

The Court adopts the pertinent facts of the underlying offenses, as summarized by the California Fifth District Court of Appeal. A presumption of correctness applies to these facts. *See* 28 U.S.C. § 2254(e)(1); *Crittenden v. Chappell*, 804 F.3d 998, 1010-11 (9th Cir. 2015).

### FACTUAL SUMMARY

> Just after midnight on July 28, 2015, police responded to a report of shots fired at the Ashwood Garden apartment complex in Fresno. At the scene, officers discovered an unconscious man bleeding and lying on the ground on the north and east side of the apartment complex. It appeared he was shot, and he was transported to the hospital where he died from a gunshot wound in his back that perforated his heart and one of his lungs. Upon autopsy, the death was ruled a homicide.

**I.    Prosecution Case**

**A.    The Shooting and Arrest of Defendants**

5

On the evening of July 27, 2015, Torrie McGee made arrangements with Thomas, someone she had dated, to pick him up where he was and take him to his home. McGee drove to Thomas's location at an apartment near the intersection of First Street and McKinley Avenue (First and McKinley). She texted Thomas at 10:21 p.m. that she was on her way. At 10:28 p.m., she texted Thomas that he should come outside. Thomas came out of the apartment building with Brown, who McGee knew also went by the name Bsmash. She had met Brown before, but she had not expected Thomas to have anyone with him. When they got in the car, Thomas got in the front seat and Brown got in one of the back seats. Thomas told McGee they were going to the Ranchwood apartments, which is a complex on the east side of Fresno. McGee drove straight there, making no stops.

At Ranchwood, Thomas and Brown exited the car, leaving McGee to wait inside the car for their return. Thomas and Brown walked to some apartment and were only gone for a few minutes before they returned to the car. Thomas directed McGee to go back to First and McKinley where she had originally met them. McGee drove them back to First and McKinley, but once there she parked on a different street from where she had picked them up. When she parked, they all sat in the car for a while and Brown made a call from his cell phone. McGee could not hear who was on the other end of Brown's call, but McGee assumed it was a female. Brown was telling the person on the phone that he wanted that person to call someone else and for that someone else to go to a location on First and McKinley. Brown told the person on the phone to act like they were drunk and having a party. McGee heard Brown say the word McLane, which she believed was just a street away from First and McKinley.

Brown's conversation made McGee feel "[w]eird." She did not understand why he would be telling people to come over and act like they were drunk and having a party. She began texting a friend during Brown's conversation. She texted the friend at 11:07 p.m. that "'[t]hey'" were doing "'weird ass shit'" and that "'[t]hey're having bitches set up motherfuckers up and shit ….'" She texted she did not "'want to be involved in no weird ass shit, for real, for real.'" The phone call made her scared and nervous. At 11:15 p.m., the friend sent McGee a text saying, "'Oh wow, come home,'" and McGee responded, "'No, I'm scared to say something to him,'" referring to Thomas. McGee was afraid it was going to "blow up into something bigger, or even be an argument" if she said anything to Thomas about the call.

After Brown's phone conversation ended, Thomas and Brown got out and had a conversation behind the car, which McGee could not hear. When they were done talking, they got back into the car, and McGee drove them back to where she had picked them up originally. Brown went into an apartment building to charge his phone; McGee had no idea how long Brown was in the apartment building. McGee told Thomas she needed to go home, so Thomas called or texted Brown to come back to the car. Thomas asked Brown if Brown was going to stay with Thomas, and Brown said

6

yes. Thomas then directed McGee to drive them to the intersection of Shields and Maple. McGee thought she was taking them to the Sycamore apartment complex, which is near that intersection—Thomas visited the Sycamore frequently and McGee thought he had a friend at that building that Brown knew too.

However, when they arrived at the Shields and Maple intersection, Thomas told her to go across the street to a different apartment complex—the Ashwood apartments— and to pull into the parking lot and park. McGee made a U-turn on Shields and proceeded to a parking lot in the Ashwood complex. McGee backed into a parking spot and Thomas said he and Brown would be right back. McGee did not remember telling an officer it was Thomas who told her to back into the spot. McGee stayed in the car and listened to music with the windows up. After they got out of the car, McGee heard gunshots. She did not remember how long they were out of the car before she heard the shots–she estimated it was probably less than two minutes. After she heard the gunshots, Brown and Thomas came back to the car about one minute later. She thought they were acting "[n]ormal," although she remembered telling an investigator later they were out of breath. McGee asked Thomas where they were going and he directed her to get on the nearby State Route 168 (Highway 168). She did not ask them what had happened, and she denied telling an officer that she did not ask Thomas because she was scared of him—she just never had a chance to ask him anything.

A police car pulled McGee's car over at the on-ramp to Highway 168. She thought she might have asked what was going on, and Thomas said to calm down. She denied seeing anything out of the car windows between leaving Ashwood and being pulled over on the on-ramp. She did not know whether she had any gloves in the car at that time—she had a lot of stuff in her car.

She learned later Thomas and Brown were arrested for their involvement in this incident, and they were released from jail a few days later. After his release, Thomas called her and said something to her about talking to people she was not supposed to be talking to—she assumed he meant the police. He said he would see her soon and hung up the phone, which she interpreted as a threat. This call occurred a few days before he was arrested again. She admitted she first denied hearing any gunshots when she was at Ashwood with Thomas and Brown—she was scared Thomas and Brown would do something to her if she talked to the police about what had happened.

On cross-examination, McGee testified her discomfort with Brown's cell phone conversation was related to events she thought were going to occur at First and McKinley. She did not believe anything Brown was discussing had anything to do with either the Sycamore or the Ashwood apartments. Nothing had led her to believe any type of setup was going to occur at the Ashwood apartments. She testified that at no point during the entire evening had she ever seen either Thomas or Brown with a gun. She denied knowing the victim or having ever seen him before, except perhaps

7

on social media. McGee testified she had never seen Thomas with the victim, nor had Thomas mentioned having any type of problem with the victim.

Around midnight, three people were outside at the Ashwood apartments near the common area outdoor courtyard. Jennifer was smoking with another woman, Shawna, and Shawna's 13-year-old daughter (S.L.) was also with them. Jennifer was sitting with her back to Shields Avenue (Shields) and was facing the parking lot area. She saw a silver Dodge Charger drive past the apartment complex in a west to east direction, and then came back in an east to west direction. She heard a car pull into the lot and then heard at least one car door close. Right after this, she saw two people at a distance of about 38 feet. One man wore a dark top with a hood (a hoodie) that was pulled up and dark pants or jeans. Jennifer could see dreadlocks under the hood, and she noticed the hood was pointed up like there was hair stuffed into it. She estimated the hooded man was about 5 feet 5 or 6 inches tall; she did not remember telling police she thought he was about 5 feet 9 inches tall. She thought he was thinner and shorter than the second man, and she had described him to police as a Black man in his early 20's.

The second man Jennifer saw was also Black and he was wearing a white T-shirt—he was taller and larger than the first man; she estimated he was between 5 feet 10 inches to 6 feet tall. He also had dreadlocks with lighter tips. He stood about a foot behind the hooded man. The two men stood in her view for "a minute or so" and appeared to speak to each other, although she could not hear what was said. Then, the hooded man looked over at Jennifer, Shawna and S.L., and he walked forward toward the courtyard area. The man in the white T-shirt disappeared and seemed to walk back to the carport area, but she lost sight of him. She never saw the man in the white t-shirt again at the complex.

The hooded man walked forward into the courtyard out of her sight—he was obscured by some bushes. Seconds later, Jennifer heard someone say, "'You got any trees?'" but she could not tell who said it—it came from the direction where the hooded man had gone. The voice of the person asking the question sounded male and his voice was raised as though he were yelling the question. She also heard the voice ask, "'Do you have them on you?'" She also testified she heard the voice ask, "'Are you holding?'" After these questions, she heard five or six gunshots that were coming from the direction where the hooded man had walked. The hooded man suddenly appeared again, backing up. He made a movement with his right hand, which looked strange to Jennifer as though he was putting something in his pocket, and then he turned around, looked toward Jennifer again, and took off at a jog toward the parking area. She thought perhaps he had been shot by the way he was turning and bending his head down, but she could not tell. She could not see his hands—they were in his pockets or covered by his shirt, and she never saw a gun. She did not remember telling a detective the hooded man had his hands at his waist trying to remove something before the shooting.

8

Jennifer heard the sound of a car—although she never saw it pull into the parking lot or leave before or after the shooting. From her vantage point, the view of the parking lots on the east and west sides were obscured by buildings—she could see only a portion of Shields, the road that runs in front of the complex to the south. She thought she had seen a silver-colored car slowing down on Shields before the shooting, but she had not seen the car turn into the complex's parking lot. She heard only what sounded like a car that seemed to let people out and then had to turn around because the parking lot has only one exit and entrance. After the shooting, she heard car doors close and sounds of the car pulling away.

Immediately after the shooting and hearing the car doors slam, Jennifer ran into the house to check on a woman she provided care to because that woman was calling out, given the sounds of the gunshots. Shawna and S.L. followed her into the apartment, but Shawna and S.L. went through the apartment and out the front door while Jennifer attended to the person for whom she was providing care in the apartment.

Shawna testified that around midnight on July 27 to 28, 2015, she was sitting outside with Jennifer and her daughter, S.L. As they were sitting there, she saw one man come into view about 30 feet away from her. He appeared to be a 22- to 24-year-old Black man, 5 feet 6 to 5 feet 8 inches tall, and about 140 pounds. He was wearing a hooded sweatshirt or jacket with a front pocket and jeans; the hood was covering his head, and the hood was puffy, like something was in it—she believed it was the man's dreadlocked hair.

He was walking toward the laundry room and she lost sight of him. To her, he seemed to be walking unusually, like he had something in his jacket. She could not see his hands, he had them in his jacket. She was able to see him talking and she heard him ask someone who seemed to be a little distance away, "'Do you have any trees?'" She assumed the other person she could not see said yes because she then heard him ask "'Do you have them on you?'" As soon as she heard those words, she heard gunshots. She never saw a gun and she had lost view of the person in the hood at the time of the shots. After the gunshots, she saw the hooded man running back to the west parking lot. It looked like he was carrying or hiding something. She lost sight of him when he went back to the parking lot.

Shawna and S.L. then ran to the front of the building where she knew the car had to exit, and Shawna saw the hooded man in a car with a second individual. She saw the hooded man get into a car, and saw another individual driving the car. The driver looked like a larger Black man, but she could not really see what he looked like—she thought he had on a white T-shirt, but she really could not describe what he was wearing. On cross- examination, she could not recall whether the driver was wearing a white T-shirt.

She saw the car turn west out of the parking lot toward the

9

highway. The car appeared to be a silver or gold Dodge Charger. Shawna saw a police officer in a patrol car on Shields shortly after—the officer was parked there. Shawna and S.L. told the officer that the killer was getting away in that car. The officer took off after the car. Shawna and S.L. then walked around the complex to see if anyone had been shot. They located a person facedown at the back of the complex. She and her daughter were the first people there, but shortly after that, three men joined them. Shawna recognized the victim as someone she had seen at the complex before—he would visit two brothers who lived there. The three other men included the two brothers that the victim would visit and another man. They were talking to each other saying, "I thought it was you." S.L. called 911, and Shawna and S.L. waited until the police arrived.

Shawna testified that a couple of weeks before the shooting she had had seen the Dodge Charger driven by the man in the white T-shirt. She did not remember seeing the man outside of the car.

On cross-examination, Shawna could not recall whether she had identified one of the brothers the victim would visit as the shooter to the district attorney's (D.A.) investigator, nor did she recall telling the investigator one of them might have been the shooter. She had, however, told the D.A.'s investigator that the two brothers the victim would visit had come to her door after the shooting and asked her what she was telling the police. She told the investigator she had seen one of them staring at her apartment, which made her feel a bit uneasy. The brothers were young, Black men in their 20's; they also had dreadlocks. To her, the brothers looked like the driver and the man in the hood from the night of the shooting.

S.L., who was 13 years old at the time of the shooting and 15 years old at the time of trial, testified she was visiting her mother, Shawna, at the complex the night of the shooting. Jennifer, Shawna, and S.L. were outside around midnight—Jennifer was smoking, and S.L. was on her phone watching videos. S.L. saw two people come into the complex—the first one was dressed in a black hoodie with the hood pulled over his head, but she could only see the side of his face at first. This man was Black and she described him as skinny and about 5 feet 8 inches tall. The second person was in a white T-shirt; he was not as skinny as the man in the hood and he was a little taller. She saw the man in the white T-shirt peering out from behind a wall. The man in the hoodie was looking straight ahead, and then he looked back at the man behind him in the white T-shirt. S.L. could hear that there were people by the laundry room.

S.L. explained that about five minutes before the gunshots, she had seen the victim by the laundry room. She did not know him well, but he had brought them movies in the past. Before the shooting, she heard the victim talking to other people—there was more than one voice coming from the direction of the laundry room—but she never saw anyone other than the victim. She did not recognize any of the other voices, but she heard the victim's voice and at least one other person near the laundry room.

She heard the man in the hoodie ask, "'You got any tree[s]?'" He also asked something like "'Are you holding?'" A few seconds after the man asked these questions, S.L. heard gunshots. She saw the side of the hooded man's body jump as though surprised. She described the hooded man's reaction to the shots as though it scared him, "like it wasn't supposed to go off that much." She had looked up when the hooded man started talking, and then she looked back down. She did not look back up until after about two shots were fired. There was nothing obstructing her view of the shooter, but she saw no muzzle flash. S.L. never saw a gun and she could not see the hooded man's hands—his back was to her.

After the gunshots, the hooded man turned around and went back in the direction of the west parking lot, and S.L. heard car doors. S.L. got up and went to the front gate and saw a silver car pull away. There happened to be a police officer parked on Shields in front of the apartment complex. Shawna and S.L. told the officer about the gunshots, and the officer went after the car. S.L. could not see how many people were in the car when it pulled out; she believed the windows were darkly tinted.

Shawna and S.L. found the victim with three other men around him. They were trying to call 911 and were asking the victim if he was okay. After police arrived on the scene, Shawna and S.L. went back to their apartment.

S.L. acknowledged during her trial testimony that when she was interviewed by police that night, she never told them she saw the man in the white T-shirt, and that she did not identify the man in the white T-shirt during the infield showup. She explained that when officers were questioning her, she was trying to decide for herself, but her mother kept giving her input and that was making her nervous. She did not want to give the wrong answer, and she did not want to seem as though she were lying by contradicting what her mother saw—so she just said she had not seen the man in the white T-shirt. At trial, however, her testimony was that the person in the white T-shirt she was shown at the police station was the man in the white T-shirt she had seen at the complex on the night of the shooting.

Officer Dominique Comeyne was working patrol on July 28, 2015, just after midnight. She had been dispatched to the Sycamore apartment building on Shields. She parked in front of the Sycamore apartments, which is located just to the south and across Shields from the Ashwood apartments; from her car she heard four to seven shots fired around 12:15 a.m. The shots sounded as if they were fired north of her, but were very close. Comeyne advised dispatch of the shots fired and requested additional units. She drove east on Shields, made a U-turn in front of the Ashwood apartments, and parked facing west on Shields. She started to exit her vehicle, but saw two females walking toward her. Comeyne also observed a four-door silver vehicle exiting the west side of the Ashwood complex.

Comeyne asked the females if the silver car was involved with the

shots fired, and they confirmed it was. She advised dispatch and then pursued the silver vehicle, which was headed west on Shields. The vehicle took the on-ramp to Highway 168; Comeyne lost sight of it for approximately three seconds when the car went down the ramp. She never saw any objects, including a gun, come out of the vehicle while she was pursuing it.

Comeyne performed a felony traffic stop of the silver car on the on-ramp. When additional police units arrived, the occupants of the silver vehicle were held at gunpoint and directed to exit the vehicle. McGee was the driver, Thomas exited the front passenger side of the car wearing a white T-shirt, jeans, and a black baseball hat; and Brown exited from the right rear passenger door wearing jeans, a blue shirt, and a hooded sweatshirt. McGee consented to a search of the vehicle, but no weapons were found inside.

Later, after an infield identification by witnesses, Comeyne escorted Brown. As he was walking with Comeyne, he asked her whether it was "'a positive I.D." and "'Those were the witnesses?'" Comeyne did not answer his first question, and in response to his second question she explained to him she would have to talk to the detectives.

Officer Jeffery Lee was dispatched to the on-ramp to assist with Comeyne's felony stop of the silver car. After the occupants of the silver car were safely removed, he began walking up the on-ramp from the silver car toward Shields to see if anything had been discarded prior to the stop. He found a firearm on the pavement of the on-ramp approximately 100 yards north of Shields. The slide of the gun was locked back, the magazine was attached, but there was no ammunition in it. In his experience, a slide in the locked-back position indicates the weapon had been fired until no ammunition remained.

**B.    Investigation**

Lead detective Bartlett Ledbetter arrived at the Ashwood apartments crime scene at about 2:50 a.m. He also walked through the on-ramp crime scene, where he saw a divot in the ground several feet above where the gun came to rest. The divot looked fresh to him and had some very sharp corners. The silver car stopped on the on-ramp was not searched other than the initial search consented to by McGee and performed at the time of the stop—he ordered it towed and sent to an impound lot for a search after a warrant was obtained. No drugs were found in the suspect vehicle or any of the victim's belongings. There was no indication anything had been stolen from the victim.

**1.    Witness Interviews**

Back at the Ashwood apartment complex, Ledbetter recorded an interview with each of the witnesses. His interview with Jennifer occurred at about 4:30 a.m. She indicated two men had been at the complex at the time of the shooting. One had the hood of his shirt up, and it looked as though his hair might have been stuffed in it.

She described the hooded man as being a Black male around 5 feet 9 inches tall, about 140 pounds, and in his early 20's. She told Ledbetter the second individual was a Black male in a white T-shirt and jeans with long dreadlocked hair—the second individual was bigger, taller and just a bit older than the hooded man—the second man stood approximately 5 feet 10 inches to 6 feet tall.

Part of Ledbetter's recorded interview of Jennifer was played for the jury. In that interview, Jennifer stated she did not see anyone shoot; one man was wearing a hoodie, but she could not see his face; she may have seen the man in the white T-shirt at the apartment before; and she said she would not be able to recognize the face of the man in the hoodie.

Ledbetter next interviewed Shawna. She provided a description of a suspect who was thin with a blue jacket and a hood. She also said his hood was puffy and pointed, but she never saw the suspect's hair. She also saw a vehicle leaving the west parking lot, but she did not see the driver.

A portion of Ledbetter's recorded interview with Shawna was played for the jury. Shawna told Ledbetter she had seen the Dodge Charger around the complex before. She thought there might have been someone with the person she had seen in the hood, but she "didn't see anyone, really." She did not get a "super good look" at the man in the hood; she lost sight of him after he asked questions and then a few seconds later she heard shots fired. She thought there had to be a second person because someone had to be driving the car. She described the car as a two-door vehicle, and she told Ledbetter she could not see who was in the car or how many people there were.

Ledbetter then interviewed S.L., who had been sleeping just prior to the interview. The individual S.L. saw was a Black male wearing a black sweatshirt with a hood and jeans. She described him as thin. Neither Shawna nor S.L. said they saw a person wearing a white T-shirt. Shawna was present for S.L.'s interview; Shawna interjected one time and Ledbetter told her to be quiet. Shawna said at one point in the interview she was happy law enforcement had gone after the car coming out of the complex.

## 2.    Witness Identifications

After their separate interviews at the apartments, Jennifer, Shawna and S.L. were all transported to the police station so that an infield showup of the suspects could be conducted—this happened about 5:30 a.m. Jennifer was shown Thomas first. She said she recognized him by his face and his white T-shirt. She described him as the one hanging back at the apartment complex that night. Jennifer also identified Brown. She was very sure this was the person she had seen in the hood after she asked that his hood be put up during the identification.

Ledbetter testified Shawna was hesitant as to identifying Brown, but she said she recognized him as the man she had seen. Shawna

13

thought the jacket Brown was wearing did not look like the jacket she had seen on the hooded man. As to Thomas, she thought he looked familiar, as though she had seen him before, but she could not make a positive identification. She did not recognize Thomas as anyone she had seen that night.

S.L. identified Brown as the person she saw in the hood, but when she viewed Thomas she said she had not seen him that night although he looked familiar to her.

The witnesses also participated in a field showup to identify the car they had seen. Jennifer testified the car she was shown at the on-ramp was the car she had seen on Shields before the shooting; viewing photographs from the witness stand, she identified the car in the photos as the car she had seen that night. Shawna and S.L. were together when they looked at the suspect vehicle on the on-ramp. They disagreed about whether that vehicle was the one they had seen at the apartment complex. S.L. told Ledbetter it was not the vehicle, but Shawna said there was no doubt it was the same car. To S.L. the headlights of the car on the on-ramp looked different and the windows were not tinted, although it was the same color and size as the car she had seen. On redirect, S.L. acknowledged the car on the on-ramp had its windows rolled down.

### 3.    Interview with McGee

Ledbetter testified about his three interviews with McGee, which occurred on July 28, 2015, August 6, 2015, and on February 14, 2017. In the first interview, McGee told Ledbetter she had received a call and went to the Ashwood apartments on Shields to pick up Thomas and Brown, and they were stopped by the police immediately after that. Then, she changed her story. She said she had originally picked them up at First and McKinley and drove them to various locations. She denied hearing any gunshots when parked at the Ashwood apartments but later acknowledged she had heard gunshots. She told Ledbetter that when she pulled into the Ashwood apartment parking lot, Thomas told her to back into a parking space. She said she thought it was weird they were going to that particular apartment complex because she thought they were going across the street to the Sycamore complex—she did not think Thomas knew anyone at the Ashwood apartments.

She also told Ledbetter it was only 30 seconds after the gunshots that Brown and Thomas came back to her car. She told Ledbetter that Thomas would not let her speak with Brown because he did not like her talking with his friends. She said she was afraid of Thomas; she had seen him hit a girl before and he had done something to McGee once, too.

### 4.    Evidence Collected on the On-ramp

A crime scene technician was dispatched to the on-ramp at Shields on July 28, 2015, and he documented the scene photographically. He also took photos of the firearm Officer Lee had discovered, which was unloaded. There were five cell phones discovered in the

14

vehicle. The gun was found 565 feet south of the silver car—the distance from Shields to the silver car was just over 1,000 feet. A divot was also found in the dirt along the on-ramp near the gun, although it was not conclusively made by the gun; the divot could have been there before the stop. The technician also collected samples from Brown, Thomas and McGee to test for gunshot residue (GSR).

### 5.    Evidence Collected at the Apartment Complex

The Ashwood apartment buildings are situated around a pool and outdoor courtyard areas. There are two parking lots—one to the east and one to the west of the complex that extend north from Shields; each lot has a single entrance/exit onto Shields. There are carports along the outer edge of the parking lots. Shields runs east to west on the south side of the complex.

In the middle of the complex, outside between buildings, there are two grassy courtyards to the north and south of a pool. On the south courtyard officers, located six .38-caliber shell casings, some clothing, flip-flop shoes, and bullet strikes on the exterior wall and interior of the nearby laundry room. The bullet casings were found to the west of the laundry room. The bullet strikes along the west-facing wall of the laundry room and the laundry room door measured from around 28 to 52 inches off the ground. Of the four bullet holes in the laundry room, three bullets were recovered; one of the bullets penetrated a dryer inside the laundry room and was not recovered. A deformed copper- jacketed bullet was found in the east parking lot. A secondary crime scene was also located at the north end of the complex toward the easterly located buildings. This is where officers located the victim, blood, a shoe, and a cell phone. An investigating officer testified it was 79 degrees at 11:53 p.m. on the night of the shooting, and the lighting was relatively good as he could identify faces at 50 to 60 feet.

### 6.    Evidence Collected From the Car After Impound

On July 31, 2015, after the suspect vehicle was photographed and searched at a secured impound lot, black knit gloves were found on the floorboard of the rear right passenger compartment. Three cell phones were located in the center console. GSR swabs were taken from the door handles and seatbelts, and the gloves were preserved in a refrigerator for DNA testing.

### 7.    GSR, Fingerprints and DNA

Kaitlin Bauer, a criminologist, testified that GSR is made of microscopic particles that are formed when a gun is fired; GSR has three main parts—lead, barium and antimony. The particles can be found in two-component parts, rather than three— although two-component particle combinations are not themselves GSR but they will, when found with three-component particles, help to establish that GSR is present.

Generally, someone within three to five feet of a fired weapon will

15

have GSR on them. Those GSR particles will start to diminish after about four to six hours. The presence of more than three GSR particles is indicative of being near a weapon when it is fired. However, three or fewer GSR particles is considered a low-level sample, and it is difficult to exclude environmental transfer as the source of that number of particles. When a sample has more than three particles, environmental transfer is much less likely to be the source of the GSR.

GSR samples were acquired from the hands of Thomas, Brown and McGee; each were analyzed, and the gloves found in the back, right side of the car were also tested and analyzed. The sample from Brown's left hand contained only one 3-part component particle, and his right hand contained one 2-part component particle. Bauer concluded GSR was present, but at a very low level.

Thomas's right hand had four 3-component particles; his left hand had three 3- component GSR particles and two 2-component supportive particles. GSR was therefore present on his hands, environmental contamination was less of a concern, and the sample indicated Thomas had some sort of interaction with GSR recently—i.e., he fired a firearm or was in the vicinity of one being fired.

McGee had one 3-part component particle on her right hand, and nothing on her left. GSR was therefore present, but one particle is a very low-level sample and could have come from an environmental source.

The gloves found in the car were tested for GSR. The right glove contained fourteen 3-component GSR particles and six 2-component particles. On the left glove, there were seventeen 3-component GSR particles, as well as nine 2-part component particles. Bauer explained GSR can get onto gloves by an individual firing a weapon while wearing the gloves, being near a weapon that is fired while wearing the gloves, or coming into some sort of contact with a surface or individual with GSR while wearing the gloves.

On cross-examination, Bauer acknowledged GSR can be transferred from police contact if the officer has fired their service weapon recently. It can also be transferred from handling ammunition.

A latent print analyst, Vincente Guerreo, testified fingerprints were found on the gun, but they lacked clarity and the results were inconclusive and could not be positively matched to Thomas or Brown. Brooke Dorval, a supervisor with the crime scene section for the police department, testified there were no fingerprints recovered from the gun magazine or the bullet casings found at the apartment complex.

Buccal swabs were obtained from Thomas, Brown and McGee and analyzed and compared with DNA collected from various items at the crime scenes. Criminologist Johnny Upshaw testified DNA found on the gun, magazine, and the gloves could not be

interpreted—too many samples were found on each that the mixture could not be interpreted—it was neither inclusive nor exclusive of Brown and/or Thomas.

A senior criminologist, Michael Appel, testified about testing he performed on the casings and the bullets recovered at Ashwood and the gun and magazine recovered at the side of the on-ramp. The firearm from the on-ramp was a .38-caliber semiautomatic pistol. Appel explained that semiautomatic and automatic firearms have a slide that feeds a bullet cartridge into the gun's chamber; when the trigger is depressed, the gun will fire the cartridge and the slide will come back again, ejecting the fired cartridge case and feeding a new bullet into the chamber. A semiautomatic will only perform that action once per trigger pull. Upon firing a bullet, semiautomatics will eject the bullet cartridge case. The casings recovered in this case were all .38-caliber, but two of them were from a different manufacturer than the other four. Appel explained that casings will fly about 10 to 15 feet from where the weapon is fired.

Upon test-firing the gun found on the on-ramp, Appel determined it fired normally. The gun also locked the slide back when the ammunition in the magazine was depleted—which is what the gun is designed to do when functioning normally. On a gun like this, the slide can also be locked back manually. This gun was a single-action/double-action. When the gun was fired in single-action mode, the trigger pull took about 7.5 pounds of force; when operating in double-action mode, the trigger pull required greater than 12 pounds of force.

Appel explained how the gun's barrel leaves distinctive markings on the ammunition it fires. From that, it can be determined whether any bullets recovered were fired from that particular weapon. Appel testified all six of the casings recovered at the scene were fired from the gun recovered on the on-ramp. But because of distortion, he could not determine whether two of the four bullets recovered at the apartment complex were fired from the gun found at the on-ramp, but they both shared class characteristics with that gun (items 9 & 11). However, the other bullets recovered from the laundry room wall were fired from the gun at the on-ramp (items 10 & 12). And, it was also conclusively determined the bullet recovered from the victim's body was fired from the gun found on the on-ramp (item 13). That bullet, however, had a flat spot on it that was indicative of ricocheting off of something hard. These results were verified and confirmed on independent testing by another criminologist.

### 8.    Cell Phone Data

Officer Antonio Rivera spoke to Thomas as part of his investigation on July 28, 2015. Thomas indicated his cell phone number, and he identified one of the cell phones found in the car as his. That phone was booked as item 60. Brown identified three cell phones from the car as his: a ZTE Concord phone, labeled item 61; an Apple iPhone 6, labeled item 63; and an LG Optimus, labeled item 62. McGee identified a Samsung Galaxy Note 3 as her phone, it was labeled

1    item 64.

2    Forensic examination of the cell phones was performed by James
     Lutter. In the data extraction of Thomas's phone (item 60), one of
3    the contacts in the phone was listed as "N.O. Bee." Contact N.O.
     Bee sent a text message to Thomas's phone on July 27, 2015, at
4    6:48 p.m. that said, "'Tell Bsmash call ASAP, it's important.'" At
     9:49 p.m. that night, Thomas's phone sent a text message to N.O.
5    Bee that said, "'Bro, we need tht now.'" A message was received
     and read by Thomas's phone from N.O. Bee that said, "'Bro, ain't
6    no bullets in DEA … The bitch at work. I'm wot rog right now.'"
     Thomas's phone sent a message to N.O. Bee that said, "'Where the
7    thang???'" N.O. Bee responded to Thomas's phone, "'At the crib,
     bro.'" N.O. Bee also sent a message to Thomas's phone that said,
8    "'I wish you woulk ta told me before I left da crib this morning.'"
     Thomas's phone sent a message back to N.O. Bee saying, "'Damn,
9    but no bullets.'" N.O. Bee responded to Thomas's phone:
     "'Exactly.'" Thomas's phone sent a text message back to N.O. Bee
10   that said, "'Okay.'"

11   Thomas's phone also communicated with McGee's phone (item
     64). There was no name associated with her number in Thomas's
12   contacts. There were four phone calls and four text messages
     between Thomas's and McGee's phones on July 27, 2015, which
13   had been deleted before the phone data was extracted. McGee's
     phone sent a text to Thomas's phone at 10:21 p.m. that said, "'On
14   m[y] way.'" A second message was sent from McGee's phone to
     Thomas's phone at 10:28 p.m. that said, "'Come outside.'"

15
         **9.      The Autopsy**
16
     The victim was found to have a bullet entrance wound on the left
17   side of his back. There was no stippling around the entrance site,
     indicating the gunshot came from a distance greater than 24 to 30
18   inches. The copper-jacketed bullet, which the coroner was able to
     recover from the victim's body, had traveled through the left rib,
19   the lower lobe of the left lung, and had pierced the victim's heart.
     Abrasions around the victim's forehead and nose were consistent
20   with a fall. The cause of death was deemed the gunshot to the back,
     and the victim's death was ruled a homicide.

21
         **10.      Interview and Hearing Statements of McGee**
22
     On August 6, 2015, Ledbetter interviewed McGee again. For the
23   first time, she talked about overhearing Brown on the phone and
     that there was some sort of setup planned. She never mentioned
24   McLane High School, nor did she reference First and McKinley in
     relation to this setup. She made some reference to a meeting
25   happening at Mayfair, but she also indicated she did not believe the
     Mayfair area included the Shields and Maple intersection where the
26   Ashwood apartment complex was located. She denied she knew
     anything was going to happen at Ashwood apartments that night,
27   and she said there was no plan or conversation about what was
     supposed to happen at Ashwood.

28

In February 2017 at a follow-up interview with McGee, Ledbetter asked her if she knew anything about men's gloves in her car—she said there should not be any gloves in her car other than perhaps latex gloves she had used for previous work she performed at a warehouse.

In September 2017, McGee gave testimony at a pretrial hearing where she again discussed Brown's phone conversation that she heard in the car the night of the shooting. She indicated she heard Brown say something to the effect the setup was going to happen near McLane High School. That was the first time Ledbetter had heard her use McLane as a location for the setup that she believed Brown was orchestrating.

### 11.    Arrest and Rearrest of Thomas and Brown

Thomas and Brown were arrested on July 28, 2015, but they were released on July 30, 2015, because the allowable period to detain them without charging them with a crime had expired. After additional evidence was processed, Ledbetter sought arrest warrants for Brown and Thomas, which were issued on July 31, 2015. Thomas was arrested on August 21, 2015 and by then had cut off his braids/dreadlocks. Brown was arrested in Las Vegas on September 22, 2015.

(Doc. No. 11-2 at 2329-48 (footnotes omitted)).

## IV.    ANALYSIS

Each of Petitioner's grounds were raised on direct appeal to the Fifth Appellate District Court and denied, then subsequently raised and summarily denied by the California Supreme Court. Thus, each ground is exhausted, and the Court looks through to the Fifth Appellate District's reasoned decision in evaluating the claims under the deferential standard of review. *Wilson*, 138 S. Ct. at 1192.

### A.    Ground One-Insufficient Evidence

In his first ground, Petitioner argues there was insufficient evidence to support his murder conviction. (Doc. No. 1 at 26).

#### 1.  State Court Decision

The Fifth Appellate District denied Plaintiff's sufficiency of the evidence claim as follows:

Brown and Thomas argue there is no substantial evidence of deliberation and premeditation to support a first degree murder conviction, and they maintain the verdict must be reversed or reduced to second degree murder.

19

1

2      Thomas also joins Brown's additional argument that there is no
       substantial evidence of an intent to kill under either a direct or
3      transferred intent theory that could support a first degree murder
       conviction. As such, they argue the jury should not have been
4      instructed on transferred intent and the verdict must be reversed on
       this additional basis.

5      **A.  Standard of Review**

6      "The Due Process Clause of the Fourteenth Amendment denies
       States the power to deprive the accused of liberty unless the
7      prosecution proves beyond a reasonable doubt every element of the
       charged offense" (*Carella v. California* (1989) 491 U.S. 263, 265,
8      citing *In re Winship* (1970) 397 U.S. 358, 364), and the verdict
       must be supported by substantial evidence (*People v. Zamudio*
9      (2008) 43 Cal.4th 327, 357. On appeal, the relevant inquiry
       governing a challenge to the sufficiency of the evidence "'is
10     whether, after viewing the evidence in the light most favorable to
       the prosecution, *any* rational trier of fact could have found the
11     essential elements of the crime beyond a reasonable doubt.'"
       (*People v. Nguyen* (2015) 61 Cal.4th 1015, 1055.) "The record must
12     disclose substantial evidence to support the verdict—i.e., evidence
       that is reasonable, credible, and of solid value—such that a
13     reasonable trier of fact could find the defendant guilty beyond a
       reasonable doubt." (*People v. Zamudio*, *supra*, at p. 357.)

14

15     "In applying this test, we review the evidence in the light most
       favorable to the prosecution and presume in support of the
16     judgment the existence of every fact the jury could reasonably have
       deduced from the evidence." (*People v. Zamudio*, *supra*, 43 Cal.4th
17     at p. 357.) "'[I]t is the jury, not the appellate court which must be
       convinced of the defendant's guilt ....'" (*People v. Nguyen*, *supra*,
18     61 Cal.4th at pp. 1055–1056.) "A reversal for insufficient evidence
       'is unwarranted unless it appears "that upon no hypothesis whatever
19     is there sufficient substantial evidence to support"' the jury's
       verdict." (*People v. Zamudio*, *supra*, at p. 357.)

20     To be guilty of first degree murder, the prosecution must prove
       beyond a reasonable doubt that the defendant acted with the intent
21     to kill, and with premeditation and deliberation. (*Alcala v. Superior
       Court* (2008) 43 Cal.4th 1205, 1223.)

22

23     **B.  Substantial Evidence of an Intent to Kill (Express Malice)**

24         **1.  Background**

25     There was no evidence offered at trial about Brown's and/or
       Thomas's motive to kill the victim or any link between Brown
26     and/or Thomas and the victim killed. The bullet that struck and
       killed the victim had ricocheted after first striking another surface.
27     S.L. testified she heard the voice of another person in addition to
       the victim near the laundry room a few minutes before the shooting,
28     although she never saw anyone other than the victim in that
       location.

Based on the lack of evidence of a motive, the fact the victim was killed with a ricocheted bullet, and S.L.'s testimony about the possible presence of another person near the laundry room, the prosecutor requested an instruction on transferred intent, arguing it was possible for the jury to infer the victim was not Brown's intended target. The court instructed the jury on the doctrine of transferred intent: "If the defendant intended to kill one person but by mistake or accident killed someone else instead, then the crime, if any, is the same as if the intended person had been killed."

During his closing argument, the prosecutor told the jury the following: "And there's a thing called transferred intent. That is important in a case like this. If the defendant intended to kill one person but by mistake or accident killed someone else instead, then the crime, if any, is the same as if the intended person had been killed. One thing that I can't prove to you is who … Brown intended to shoot at that night. It might have been [the victim], it might have been another person. I can't establish that. However, that instruction, transferred intent, means that that's not necessary to prove to have a murder conviction. It doesn't matter who he was trying to shoot at."

Defendants argue this portion of the prosecutor's closing argument was an express concession that the state could not prove that Brown and Thomas intended to kill the victim pursuant to a direct intent-to-kill theory. In addition, defendants contend, there was no substantial evidence of any other intended target, and the court should not have instructed on transferred intent. Because the prosecutor conceded there was no evidence to prove a direct intent to kill the victim, and because there was no substantial evidence of any other intended target to support a transferred intent theory, there was insubstantial evidence of the intent to kill required to support a verdict of first degree murder.

The People maintain the evidence was clearly sufficient to sustain a finding of Brown's intent to kill *someone*—either the victim who was shot or another intended target. The People argue the evidence Brown fired a gun toward the victim in a close- range manner that could result in the infliction of a mortal wound had the bullet been on target supports an inference of the intent to kill. The People maintain there was evidence from which the jury could have concluded either the victim or another target was the object of that intent to kill.

### 2. Analysis

"A killing with express malice formed willfully, deliberately, and with premeditation constitutes first degree murder." (*People v. Beltran* (2013) 56 Cal.4th 935, 942.) Express malice requires an intent to kill "unlawfully." (§ 188, subd. (a)(1).) "Intent to unlawfully kill and express malice are, in essence, 'one and the same.'" (*People v. Smith* (2005) 37 Cal.4th 733, 739 (*Smith*), quoting *People v. Saille* (1991) 54 Cal.3d 1103, 1114.) Express malice requires a showing the assailant either desires the result— i.e., death, or knows to a substantial certainty, death will occur.

(*People v. Davenport* (1985) 41 Cal.3d 247, 262.)

The doctrine of transferred intent applies to the mental state for murder. The doctrine applies when the defendant intends to kill one person, but mistakenly kills another. (*People v. Bland* (2002) 28 Cal.4th 313, 317.) The intent to kill the intended target is deemed to transfer to the unintended victim so that the defendant is guilty of murder. (*Ibid.*) "[A]ssuming legal causation, a person maliciously intending to kill is guilty of the murder of all persons actually killed. If the intent is premeditated, the murder or murders are first degree." (*Id.* at pp. 323–324, fn. omitted.)

Despite the prosecutor's statement to the jury during closing argument that he could not prove "who … Brown intended to shoot at that night," there was substantial evidence to support the jury's verdict under either theory of intent. When evaluating whether a verdict is supported by substantial evidence, a reviewing court examines the *evidence* presented to the jury. The prosecutor's statements and arguments are not evidence, and the jury was so instructed. The existence or lack of substantial evidence does not rise or fall on the wording or phrasing the prosecutor selects—the prosecutor's argument can neither manufacture substantial evidence where there is none, nor sweep away substantial evidence that has been presented. Here, there is substantial evidence Brown acted with the express malice—i.e., the intent to kill—required for first degree murder, regardless whether the jury concluded the victim was the object of that intent or whether that intent was directed toward another target.

As explained in *Smith*, there is rarely direct evidence of a defendant's intent to kill. Such intent is usually derived from all the circumstances, including the defendant's actions. (*Smith*, *supra*, 37 Cal.4th. at p. 741.) In reviewing a series of general principles, the court observed that "'[t]he act of firing [a gun] toward a victim at a close, but not point blank, range "in a manner that could have inflicted a mortal wound had the bullet been on target is sufficient to support an inference of intent to kill .…" [Citation.]'" (*Ibid.*) The People cite *Smith* for this proposition and argue Brown's act of shooting the gun six times toward the laundry room was substantial evidence of an intent to kill, even though the bullet that hit the victim was a ricochet.

Defendants assert that *Smith* has no application here because it is factually distinguishable. *Smith* involved two counts of attempted murder based on the defendant's act of firing a single bullet into a slowly moving vehicle, narrowly missing his ex-girlfriend and her child in the back seat. (*Smith*, *supra*, 37 Cal.4th at p. 736.) Transferred intent does not apply to attempted murder; thus, to establish *attempted* murder as to both the ex-girlfriend and the child, the prosecution had to prove the defendant acted with an intent to kill both the ex-girlfriend *and* the baby when he fired the gun. The court concluded the defendant's act of firing a single round at both mother and baby from close range, each of whom the defendant knew was directly in his line of fire, allowed the jury to infer he acted with the intent to kill both victims. (*Id.* at p. 743.) We

agree with defendants that, as an attempted murder case, *Smith* is factually distinguishable, but the principles *Smith* discussed relevant to intent to kill are applicable here.

In *Smith*, before reaching the issue of whether Smith's intent to kill was specific to each victim, a factor not relevant here where *attempted* murder is not at issue, the court reviewed principles relevant to establishing express malice—a requirement in both first degree willful, deliberate and premeditated murder *and* attempted murder. The court articulated two principles of law: first, while motive may often be probative of intent to kill, it is not an element of a criminal offense and it is not required to establish an intent to kill; second, intent to kill may be inferred from the defendant's acts and the circumstances of the crime. (*Smith*, *supra*, 37 Cal.4th at pp. 740–741.) As to the second principle, the court explained the act of firing toward a victim at close, but not point blank, range in a manner that could have inflicted a mortal wound is sufficient to support an inference of the intent to kill. (*Id.* at p. 741.)

The court explained that these legal principles together reflected that "the act of purposefully firing a lethal weapon at another human being at close range, without legal excuse, generally gives rise to an inference that the shooter acted with express malice. That the shooter had no particular motive for shooting the victim is not dispositive, although again, where motive is shown, such evidence will usually be probative of proof of intent to kill. Nor is the circumstance that the bullet misses its mark or fails to prove lethal dispositive—the very act of firing a weapon '"in a manner that could have inflicted a mortal wound had the bullet been on target"' is sufficient to support an inference of intent to kill." (*Smith*, *supra*, 37 Cal.4th at p. 742.)

These general principles discussed in *Smith* apply with equal force here where the intent to kill must be established to support the first degree murder conviction. Construing the evidence in the light most favorable to the judgment and drawing all reasonable inferences therefrom, Brown carried a loaded semiautomatic pistol to an apartment building in the middle of the night. Despite the 79-degree temperature, Brown had his hood up over his head to conceal his appearance and gloves on to prevent GSR from transferring to his hands upon firing the gun. All of the witnesses saw him with his hood up, and gloves with a significant amount of GSR were found in McGee's car where Brown had been sitting.

Brown had his hand on the gun while he carried it—witnesses testified Brown had his hands in his pockets and it appeared he was carrying something. Brown was ready to quickly fire the gun upon acquiring his target. Brown got his target's attention by asking a couple of questions and then immediately discharged the .38-caliber gun six times in the direction of where the victim had been seen and heard minutes before, emptying the magazine of bullets.

There is no evidence to support an inference the gun was fired at the ground or was somehow fired only to scare the victim or anyone else. All of the gun's ammunition was used, and the gun was fired

at human height, evidenced by where the bullets struck the laundry room wall. The jury could infer the gun was aimed to inflict maximum damage on humans in the path of the bullets. (See *People v. Leon* (2010) 181 Cal.App.4th 452, 463–464 [reasonable to infer shot fired at a car's taillight was pointed in the direction of the passenger compartment and that the defendant intended to kill when the backseat passenger was hit by the bullet].) The gun used was powerful—the forensic evidence showed several of the bullets pierced the wall of the laundry room and traveled into the laundry room. The trigger on this particular gun required a fair amount of force to pull—from 7.5 pounds in single-action mode to 12 pounds in double-action mode—supporting an inference the trigger was pulled six times intentionally, not accidentally.

The circumstances of the shooting in combination with evidence the victim and possibly one other person were in the vicinity of the laundry room minutes before the shooting supplied substantial evidence Brown intended to kill whomever the jury concluded he was ultimately targeting.

Defendants maintain that because no one was hit *directly* with a bullet and there is no direct evidence about where Brown aimed the gun, it cannot be established beyond reasonable doubt Brown fired the gun with an intent to kill anyone. Defendants cite *People v. Ratliff* (1986) 41 Cal.3d 675 and *People v. Virgo* (2013) 222 Cal.App.4th 788 (*Virgo*) for the proposition merely firing a weapon does not, in itself, establish an intent to kill. But *Ratliff* is inapposite because the court's discussion there related to what the jury must have *necessarily* concluded about the shooter's intent in considering whether an instructional error was harmless, not whether the shooting under those circumstances constituted substantial evidence of an intent to kill. (*People v. Ratliff*, *supra*, at pp. 695– 696.)

*Virgo* is similarly unhelpful. In considering whether several attempted murder convictions were supported by substantial evidence, *Virgo* observed the defendant's shots fired at the ceiling inside the house did not establish the attempted murder of deputies outside the house taking cover on the ground. (*Virgo*, *supra*, 222 Cal.App.4th at p. 799.) Unlike some of the shots fired by the defendant in *Virgo*, nothing similar here suggests Brown fired shots that bore no possible relationship to where the victim or another target was located.

That the victim was hit with a ricochet does not conclusively establish the victim was not in Brown's line of fire. The jury could have reasonably concluded the fact the victim was hit with a ricochet bullet was due to Brown's ineffective shooting abilities, especially since he fired so many times, or that the victim was trying to get away when Brown opened fire. The bullet struck the victim in his back, and the victim ultimately collapsed at the north side of the building away from the laundry room. Brown fired the gun repeatedly toward the location where the victim had been seen and the victim was actually hit with a bullet. There was substantial evidence Brown shot the gun with an intent to kill. The jury could

have reasonably concluded the victim was the object of that intent.

Defendants argue there was no substantial evidence to support a transferred intent theory because the prosecution never established definitively that someone else was present at the scene—no one was seen coming or going from the laundry room area, and there was no evidence the other person was the intended target or that Brown harbored a premeditated intent to kill that person. As discussed *ante*, the evidence strongly supported a conclusion Brown acted with an intent to kill given the circumstances of how he fired the gun six times toward the direction of the laundry room, regardless of his specific target. The jury could have reasonably concluded the victim was his target, but the jury could have reasonably drawn a different conclusion given that the victim was hit with a ricocheted bullet in combination with S.L.'s testimony that she heard another voice near the laundry room before the shooting. As defendants have repeatedly noted, the ricochet bullet could support a conclusion the victim was not in the direct line of fire.

In sum, substantial evidence established Brown intended to kill whomever he was specifically targeting at the laundry room—the evidence of that intent to kill did not hinge on the specific identity of his target. The substantial evidence allowed the jury to reasonably conclude the object of Brown's intent to kill was either the victim or the other person S.L. heard near the laundry room before the shooting.

### C. Substantial Evidence of Premeditation and Deliberation

Defendants additionally contend there was no substantial evidence of premeditation and deliberation, and the first degree murder verdict is therefore unsupported and must be reversed.

#### 1. Legal Standard

An intentional killing (express malice) "that is premeditated and deliberated is murder of the first degree." (*People v. Cortez* (1998) 18 Cal.4th 1223, 1232.) "'An intentional killing is premeditated and deliberate if it occurred as the result of preexisting thought and reflection rather than unconsidered or rash impulse.'" (*People v. Pearson* (2013) 56 Cal.4th 393, 443.) "The very definition of 'premeditation' encompasses the idea that a defendant thought about or considered the act beforehand." (*Ibid.*) Deliberate means "'"'formed or arrived at or determined upon as a result of careful thought and weighing of considerations for and against the proposed course of action.'"'" (*People v. Houston* (2012) 54 Cal.4th 1186, 1216.)

"The process of premeditation and deliberation does not require any extended period of time. 'The true test is not the duration of time as much as it is the extent of the reflection. Thoughts may follow each other with great rapidity and cold, calculated judgment may be arrived at quickly ....'" (*People v. Houston, supra,* 54 Cal.4th at p. 1216.)

25

"In *People v. Anderson* (1968) 70 Cal.2d 15, 26–27 [(*Anderson*)], [the Supreme] [C]ourt reviewed earlier decisions and developed guidelines to aid reviewing courts in assessing the sufficiency of evidence to sustain findings of premeditation and deliberation. [Citation.] [The court] described three categories of evidence recurring in those cases: planning, motive, and manner of killing." (*People v. Halvorsen* (2007) 42 Cal.4th 379, 419–420.) "[H]owever, '[u]nreflective reliance on *Anderson* for a definition of premeditation is inappropriate.'" (*People v. Koontz* (2002) 27 Cal.4th 1041, 1081; accord, *People v. Casares* (2016) 62 Cal.4th 808, 824, disapproved on another ground by *People v. Dalton* (2019) 7 Cal.5th 166, 214.) The California Supreme Court recently reiterated, "In the years since *Anderson*, '"we have emphasized that its guidelines are descriptive and neither normative nor exhaustive, and … reviewing courts need not accord them any particular weight."' [Citation.] *Anderson* provides 'a framework to aid in appellate review,' but it does not 'define the elements of first degree murder or alter the substantive law of murder in any way.'" (*People v. Morales* (2020) 10 Cal.5th 76, 89, quoting *People v. Rivera* (2019) 7 Cal.5th 306, 324 & *People v. Perez* (1992) 2 Cal.4th 1117, 1125; accord, *People v. Casares*, *supra*, at p. 824; *People v. Halvorsen*, *supra*, at p. 420.)

Yet, the verdict may not stand if based only on '"fanciful theories and unreasonable inferences [or] resort to imagination or suspicion." [Citation.]' [Citation.] 'Mere conjecture, surmise, or suspicion is not the equivalent of reasonable inference and does not constitute proof.'" (*Anderson*, *supra*, 70 Cal.2d at p. 24.)

Our task on review is to determine whether "*any* rational trier of fact could have been persuaded beyond a reasonable doubt" that the murder was deliberate and premeditated. (*People v. Perez*, *supra*, 2 Cal.4th at p. 1127.) Even where a reviewing court could make contrary factual findings or draw different inferences from that of the jury, "we are not permitted to reverse the judgment if the circumstances reasonably justify those found by the jury. It is the jury, not the appellate court, that must be convinced beyond a reasonable doubt." (*Id.* at p. 1126.)

### 2. Analysis Regarding Brown

Defendants argue the finding of premeditation and deliberation was not supported by any substantial evidence could only have been based on improper speculation or conjecture.

We disagree. There was ample circumstantial evidence from which the jury could infer the killing was premeditated and planned in advance, and the evidence about the manner of killing strongly supported an inference the killing was willful and deliberative.

### a. Planning

Defendants argue there is no evidence of planning, but we find an ample basis for the jury to reasonably infer Brown had planned the

shooting well before getting to the apartment complex.

A reasonable juror could have concluded Brown went to the Ashwood complex equipped with a concealed and loaded semiautomatic weapon with a plan to kill someone. (See *People v. Miller* (1990) 50 Cal.3d 954, 993 [keeping pipe in a car and then using it to kill people reasonably suggests the defendant considered the possibility of murder in advance and exhibited planning activity].) There was evidence that Brown knew the vehicle was poised for a quick getaway in a parking lot that had only a single ingress/egress. He wore a hood on a balmy 79-degree night from which it could be inferred he meant to cover up his dreadlocks and obscure his appearance, and there was evidence he wore gloves from which it could be inferred he meant to prevent GSR from transferring to his hands. The witnesses reported Brown walked with his hands in his pockets, and it appeared as though he were carrying something. This was evidence from which a reasonable juror could infer he walked through the complex with his hand on the gun. There was no evidence he appeared to be lost, confused, or was wandering around the complex—he walked from the direction of the west parking lot toward the laundry room. It took him less than three minutes outside of the car to accomplish the shooting and return to the car.

Brown knew where he was going and who he was looking for—an inference that was supported by the entire arch of the evening's events, the fact he and Thomas were only out of the car for mere minutes before the shooting occurred, and the conversation McGee overheard about a deliberate, prearranged setup. The two or three questions witnesses heard and saw Brown ask in the courtyard were followed *immediately* by the sound of gunshots, which supported an inference Brown had located the victim and fired as soon as the victim looked up or engaged with the questions. The timing of the questions followed by the gunshots also supported an inference the victim had been preselected before Brown even arrived at the complex—there was no argument, conversation, or even hesitation between the questions and the shooting. (See *People v. Miranda* (1987) 44 Cal.3d 57, 87 [lack of provocation by victim allows an inference that the attacks were result of deliberate plan rather than "'rash explosion of violence'"], abrogated on another ground by *People v. Marshall* (1990) 50 Cal.3d 907, 993, fn. 4.) The evidence pointed to an orchestrated and preplanned shooting of a particular person in a particular location.

Brown argues there were different inferences the jury could have drawn. McGee related very few details about Brown's conversation that she overheard, and she was convinced it had nothing to do with the shooting at Ashwood. Brown and Thomas had conversations that night out of McGee's presence, but Brown points out there was no evidence what was said. It is true the jury could have drawn different inferences about the evidence. However, it is not a reviewing court's role to reevaluate the evidence. (*People v. Brooks* (2017) 3 Cal.5th 1, 58.) Rather, we must presume the existence of every fact in support of the verdict that could reasonably be inferred from the evidence. (*People v. Booker* (2011) 51 Cal.4th 141, 173.)

Moreover, Brown's argument ignores the fact that he carried a loaded weapon into a specific apartment complex with a car and driver waiting, put up his hood and wore gloves on a nearly 80-degree night, kept his hands in his pocket with the weapon, walked directly to where his victim was located, and fired the gun immediately upon obtaining confirmation his selected victim was present through the use of the questions. All of this was accomplished in about two or three minutes, after which Brown immediately returned to the vehicle, took off the gloves, and got rid of the weapon. There was ample evidence of planning.

### b. Manner of the Killing

Another factor the *Anderson* court identified that may establish a deliberate and premeditated killing is how the killing is carried out—i.e., the manner of killing. Such evidence will tend to show the killing "was so particular and exacting that the defendant must have intentionally killed according to a 'preconceived design' to take his victim's life .…" (*Anderson*, *supra*, 70 Cal.2d at p. 27.) Here, there were facts about the manner of the killing from which the jury could infer that Brown intentionally killed the victim according to a preconceived plan or design.

Defendants argue nothing about the manner of killing indicates a preconceived plan or design. Defendants point out there may have been others beside the victim present at the laundry room, and there was no indication where the victim was standing when the shots were fired. The victim was killed with a ricochet bullet, suggesting the gun was not aimed at the victim, and S.L. testified she thought Brown looked surprised when the gun went off so many times. Defendants maintain this evidence was much more consistent with a random explosion of violence rather than a calculated murder.

We disagree. As noted, the entire process of getting to the laundry room, locating the target, and shooting the gun six times took only about two minutes. Significantly, Brown did not fire the gun once or twice; he fired *six* times, emptying the magazine. The 7.5 to 12 pounds of pressure needed to repeatedly pull the trigger indicates firing that many shots was no accident. He fired the shots from west to east toward where the victim had been seen near the laundry room minutes before. Most of the bullets hit the west-facing side of the laundry room wall about two feet to four feet above the ground. It can be inferred these shots were meant to strike at human height. He fired the gun without hesitation or delay after posing a few questions; the gun was so powerful several of the shots passed through the wall of the laundry room. (See *People v. Wright* (1985) 39 Cal.3d 576, 594 [shooting victim on sight with no hesitation at close range with large- caliber gun "could well support an inference by the jury that the manner of killing was 'particular and exacting'"].)

Together, the evidence reflects not just planning in advance—the gun, the ammunition, the gloves, the hood, the phone call about a setup—but also careful considerations of a course of conduct while engaged in the process of locating the victim and firing a powerful

1          gun at human height until it was out of ammunition.

2          Given the evidence of planning and how the killing was performed,
           substantial evidence supported the jury's conclusion of a willful,
3          deliberative and premeditated murder.

4      (Doc. No. 11-2 at 2349-62 (footnotes omitted)).

5                          **2.  Federal Habeas Analysis**

6              In arguing there was insufficient evidence to support his conviction, Petitioner focuses on

7      the lack of evidence to support a transferred intent based theory because there was no proof that

8      an intended target was at the scene of the shooting.  (Doc. No. 1 at 29).  Petitioner asserts that

9      "[i]n order to obtain a conviction of first degree murder based on a transferred intent theory, the

10     state must at the very least provide sufficient evidence to prove that someone else – named or

11     not—was present at the scene, was the intended target and the defendant harbored a premeditated

12     intent to kill that person."  (*Id.* at 31).  Petitioner argues the state appellate court's analysis was

13     objectively unreasonable because (1) the facts the court relied on to support that there was

14     sufficient evidence for jurors to infer an intent to kill did not resolve the question of whether the

15     shooter intended to scare or intended to kill; and (2) the state court ignored critical facts that

16     support that the shooter fired the gun to scare the victim rather than kill the victim.  (Doc. No. 1 at

17     34-35).

18             Respondent asserts it was reasonable for the state appellate court to reject Petitioner's

19     sufficiency of the evidence claim.  (Doc. No. 12 at 19).  Respondent argues that "a jury could find

20     the most reasonable inference was that when Petitioner discharged six bullets at a person (after

21     having arranged for some person A to be at that location and after having brought the firearm to

22     that location and after briefly speaking to someone who was at the location he planned Person A

23     to be), it was because Person A was present and Petitioner was shooting with the premeditated

24     and deliberate purpose to kill Person A," and such was sufficient to support the conviction, even

25     if the person killed was "Person B."  (*Id.* at 26-27).

26             In his reply, Petitioner renews his argument that the state court ignored facts relevant to

27     the transferred intent issue and asserts that based on this failure by the state court, his federal

28     habeas claims are subject to de novo review.  (Doc. No. 15 at 8-9).  Additionally, Petitioner

1  argues "the fact of the matter is that there is no evidence at all to suggest that 'Person A' ever

2  existed" because "no one saw 'Person A' arrive on the scene, no one saw 'Person A' leave the

3  scene, the state never called 'Person A' to testify and the state neither identified 'Person A' nor

4  gave jurors a reason to think [Petitioner] intended to kill 'Person A.'" (*Id.* at 10). Thus,

5  Petitioner asserts "the state presented insufficient evidence to sustain the murder conviction on a

6  transferred intent theory." (*Id.*).

7          The Due Process Clause of the Fourteenth Amendment protects a criminal defendant from

8  conviction "except upon proof beyond a reasonable doubt of every fact necessary to constitute the

9  crime with which he is charged." *In re Winship*, 397 U.S. 358, 364 (1970). The federal standard

10  for determining the sufficiency of the evidence to support a jury finding is set forth in *Jackson v.*

11  *Virginia*, 443 U.S. 307 (1979). Under *Jackson*, "the relevant question is whether, after viewing

12  the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have

13  found the essential elements of the crime beyond a reasonable doubt." *Id.* at 319 (emphasis in

14  original); *see also Coleman v. Johnson*, 566 U.S. 650, 656 (2012) ("the only question under

15  *Jackson* is whether that finding was so insupportable as to fall below the threshold of bare

16  rationality"); *Cavazos v. Smith*, 565 U.S. 1, 2 (2011) (a reviewing court "may set aside the jury's

17  verdict on the ground of insufficient evidence only if no rational trier of fact could have agreed

18  with the jury").

19          The *Jackson* standard "must be applied with explicit reference to the substantive elements

20  of the criminal offense as defined by state law." *Jackson*, 443 U.S. at 324 n.16; *Juan H. v. Allen*,

21  408 F.3d 1262, 1275-76 (9th Cir. 2005). The reviewing court should look to state law for the

22  elements of the offense and then turn to the federal question of whether any rational trier of fact

23  could have found the essential elements of the crime supported by sufficient evidence beyond a

24  reasonable doubt. *See Johnson v. Montgomery*, 899 F.3d 1052, 1056 (9th Cir. 2018).

25          Further, when both *Jackson* and AEDPA apply to the same claim, the claim is reviewed

26  under a "twice-deferential standard." *Parker v. Matthews*, 567 U.S. 37, 43 (2012). As noted by

27  the Supreme Court:

28

1

2      First, on direct appeal, "it is the responsibility of the jury−not the
       court−to decide what conclusions should be drawn from evidence
3      admitted at trial. A reviewing court may set aside the jury's verdict
       on the ground of insufficient evidence only if no rational trier of
       fact could have agreed with the jury." And second, on habeas
4      review, "a federal court may not overturn a state court decision
       rejecting a sufficiency of the evidence challenge simply because the
5      federal court disagrees with the state court. The federal court
       instead may do so only if the state court decision was 'objectively
       unreasonable.' "

6

7   *Coleman*, 566 U.S. at 651.

8          As an initial matter, Petitioner's argument, which focuses entirely on the transferred intent

9   theory, fails to recognize that the state court concluded there was sufficient evidence to support

10  that Petitioner intended to kill the victim, rather than an unknown individual.  (*See* Doc. No. 11-2

11  at 2352-53 ("Here, there is substantial evidence Brown acted with the express malice—i.e., the

12  intent to kill—required for first degree murder, regardless of whether the jury concluded the

13  victim was the object of that intent or whether that intent was directed toward another target.").  If

14  the appellate court reasonably concluded there was sufficient evidence to support that Petitioner

15  intended to kill the victim, the lack of evidence of an intended target is immaterial.

16         In reviewing the sufficiency of the evidence, the appellate court correctly cited and

17  applied the appropriate federal standard.  The appellate court highlighted several facts that

18  supported Petitioner's intent to kill with premeditation and deliberation, explaining that Petitioner

19  "carried a loaded weapon into a specific apartment complex with a car and driver waiting, put up

20  his hood and wore gloves on a nearly 80-degree night, kept his hands in his pocket with the

21  weapon, walked directly to where the victim was located, and fired the gun immediately upon

22  obtaining confirmation his selected victim was present through the use of the questions," and

23  "[a]ll of this was accomplished in about two or three minutes, after which Brown immediately

24  returned to the vehicle, took off the gloves, and got rid of the weapon."  (Doc. No. 11-2 at 2361).

25  The cited evidence is more than sufficient to support that Petitioner acted with the requisite intent

26  to kill the victim to support his first degree murder conviction.

27         While Petitioner argues the evidence fails to establish an intent to kill rather than just

28  scare and the appellate court "ignored critical facts"  including that "although six bullets were

31

1   fired, none directly hit" the victim or an intended target and "of the six bullets fired, four hit a

2   wall in the laundry room between two and four feet above the ground showing the gun must have

3   been aimed down" (Doc. No. 1 at 34-35), the undersigned finds these arguments unpersuasive.

4   There is nothing to indicate that the appellate court "overlooked or ignored" the evidence

5   supporting Petitioner's claim. *Taylor v. Maddox*, 366 F.3d 992, 1001 (9th Cir. 2004) ("To fatally

6   undermine the state fact-finding process, and render the resulting finding unreasonable, the

7   overlooked or ignored evidence must be highly probative and central to petitioner's claim.").

8   Rather, the state appellate court specifically recognized that "[a]ll of the gun's ammunition was

9   used, and the gun was fired at human height, evidenced by where the bullets struck the laundry

10  room wall." (Doc. 11-2 at 2355).  The court explained that "[t]he jury could have reasonably

11  concluded the fact the victim was hit with a ricochet bullet was due to Brown's ineffective

12  shooting abilities, especially since he fired so many times, or that the victim was trying to get

13  away when Brown opened fire." (*Id.* at 2356).  At best, Petitioner asks this Court to now draw a

14  different inference that would negate his intent to kill, but "it is the responsibility of the jury—not

15  the court—to decide what conclusions should be drawn from evidence admitted at trial."

16  *Coleman*, 566 U.S. at 651.

17       Petitioner has failed to show that the state court's rejection of his sufficiency claim was

18  contrary to, or an unreasonable application of, clearly established Supreme Court precedent, or

19  that it was based on an unreasonable determination of the facts.  Thus, the undersigned

20  recommends ground one be denied.

21       **B.     Ground Two-Instructional Error (Burden of Proof)**

22       In his second ground, Petitioner argues that because the state had the burden of proving

23  the identity of the shooter beyond a reasonable doubt, the trial court's instruction that the jurors

24  could rely on Petitioner's statements alone undercut the presumption of innocence.  (Doc. No. 1

25  at 36).

26       ////

27       ////

28       ////

**1. State Court Decision**

The appellate court rejected Petitioner's claim that the instructions lowered the burden of proof, explaining:

> **C. Instruction on Defendant's Statement Alone (CALCRIM No. 359)**
>
> Brown argues the court's instruction under CALCRIM No. 359 violated his due process rights.
>
> **1. Background**
>
> Brown made out-of-court statements that were part of the prosecution's case. Specifically, McGee testified about what she overheard Brown saying during a phone call while she was in the car with him. Two of the witnesses at the apartment building testified that prior to the shooting they heard Brown saying "'[y]ou got any trees?'" and something like "'[d]o you have them on you?'" or "'[a]re you holding?'" Jennifer testified she heard these questions being asked in the direction of the hooded man—he had walked out of her line of sight before she heard these questions being asked.
>
> Without objection, the trial court instructed the jury pursuant to CALCRIM No. 359:
>
> "The defendant may not be convicted of any crime based on his out- of-court statements alone. You may only rely on the defendant's out-of- court statements to convict him if you conclude that other evidence shows that the charged crime was committed."
>
> "That other evidence may be slight and need only be enough to support a reasonable inference that a crime was committed."
>
> "The identity of the person who committed the crime may be proved by the defendant's statements alone."
>
> "You may not convict the defendant unless the People have proved his guilt beyond a reasonable doubt."
>
> **2. Analysis**
>
> Brown now contends this instruction was erroneous because it allowed the jury to infer Brown committed the killing based on his out-of-court statements alone, thus violating his constitutional rights to due process and to a jury determination of guilt beyond a reasonable doubt.
>
> The People correctly assert that Brown failed to object to the challenged instruction. As such, the claim is forfeited on appeal. (*People v. Covarrubias* (2016) 1 Cal.5th 838, 906.) However, even assuming the failure to object did not forfeit the issue (§ 1259), the claim lacks merit.

1

2      In reviewing the claim that the given instruction lowered the
       standard of proof, we consider whether there is a reasonable
3      likelihood the jury misapplied the instruction. (*Victor v. Nebraska*
       (1994) 511 U.S. 1, 6.) We do not view the challenged instruction in
       isolation, but consider it in the context of the instructions as a
4      whole. (*People v. Moore* (2011) 51 Cal.4th 1104, 1140.)

5      In a criminal trial, the prosecution must prove the corpus delicti, or
       the body of the crime itself—the fact of loss, injury or harm caused
6      by a criminal act. (*People v. Alvarez* (2002) 27 Cal.4th 1161, 1168–
       1169.) The corpus delicti rule is this: the prosecution must establish
7      the corpus delicti *independent* from the defendant's admissions,
       ensuring that the defendant does not admit to a crime that did not
8      occur. (*Id.* at p. 1169.) The independent proof may be
       circumstantial and is sufficient if it permits an inference of criminal
9      conduct, even if a noncriminal explanation is also possible. (*Ibid.*)
       The amount of independent proof of a crime can be slight or
10     minimal. The prosecution need make only a prima facie showing
       permitting the reasonable inference that a crime was committed.
11     Once the necessary showing of independent evidence is met, the
       defendant's extrajudicial statements may be considered by the jury
12     to strengthen the case on all issues. (*People v. Jones* (1998) 17
       Cal.4th 279, 301–302.)

13

14     The identity of the defendant as the perpetrator of the crime,
       however, is not part of the corpus delicti. Identity may be
15     established by the defendant's words alone. (*People v. Frye* (1998)
       18 Cal.4th 894, 960, disapproved on another ground in *People v.*
16     *Doolin* (2009) 45 Cal.4th 390, 421 & fn. 22.) When a defendant's
       statements form part of the prosecution's case, the trial court must
17     instruct sua sponte that a finding of guilt cannot be predicated on
       the statements alone. (*People v. Alvarez, supra,* 27 Cal.4th at p.
18     1170.) The corpus delicti rule is defined in the CALCRIM No. 359
       instruction and its predecessor, CALJIC No. 2.72. (*People v.*
19     *Rosales* (2014) 222 Cal.App.4th 1254, 1258–1259 (*Rosales*).)

20     In *People v. Rivas* (2013) 214 Cal.App.4th 1410, 1427 (*Rivas*), the
       Sixth District Court of Appeal concluded the first two paragraphs of
21     the version of CALCRIM No. 359 given in this case correctly
       stated the corpus delicti rule, but found the instruction confusing
22     with regard to the third paragraph about the declarant's identity:
       "[T]he reference to identity in CALCRIM No. 359 presents a risk
23     of confounding the jury by telling jurors that a defendant's
       inculpatory extrajudicial statements, taken alone, do not suffice to
24     allow the jury to convict the defendant of a charged crime—and yet
       those statements, again taken alone, are entertainable to prove the
25     defendant's 'identity [as] the person who committed the crime' …,
       which to any juror can only mean the defendant's identity as the
26     perpetrator, i.e., the guilty party. The instruction requires
       reconsideration." (*Rivas, supra,* at p. 1429, fn. omitted.)

27     *Rivas* acknowledged that in *People v. Foster* (2010) 50 Cal.4th
       1301 (*Foster*) the California Supreme Court upheld CALJIC No.
28     2.72—the predecessor corpus delicti instruction. (*Rivas, supra,* 214

Cal.App.4th at p. 1429, fn. 8.) But, *Rivas* distinguished *Foster* and noted the wording of CALJIC No. 2.72 differed in that it properly explained that identity was not an element of the crime, whereas CALCRIM No. 359 did not. (*Rivas*, *supra*, at pp. 1429–1430 & fn. 8.)

A year later, the Second District Court of Appeal disagreed with *Rivas*'s conclusion. In *Rosales*, the court found the third paragraph of CALCRIM No. 359 was not confusing: "It is … well established that a defendant's inculpatory out-of-court statements *may* … be relied upon to establish his or her entity as the perpetrator of a crime. [Citations.] This is because the perpetrator's identity is not part of the corpus delicti. [Citations.] [¶] CALCRIM No. 359, like CALJIC No. 2.72, clearly so states. The corpus delicti rule is stated in the first two paragraphs of CALCRIM No. 359. The law concerning proof of identity by a defendant's extrajudicial statements is correctly stated in the third paragraph. There is no danger a jury will be unable to separate the two rules any more than in CALJIC No. 2[.]27 which has been approved by our Supreme Court .… As noted, CALJIC No. 2.72 states in part: 'The identity of the person who is alleged to have committed a crime is not an element of the crime [nor is the degree of the crime]. The identity [or degree of the crime] may be established by [a][an] [confession] [or] [admission].' CALCRIM No. 359 states with greater precision and economy of language, 'The identity of the person who committed the crime [and the degree of the crime] may be proved by the defendant's statement[s] alone.' CALCRIM No. 359 correctly states the law. [Citations.] There was no reasonable likelihood the jury was confused and misapplied the instruction. Finally, CALCRIM No. 359 reminds the jury that the accused may not be convicted unless the prosecution proves guilt beyond a reasonable doubt. CALJIC No. 2.72, which was approved by our Supreme Court in *Foster*, [*supra*, 50 Cal.4th at p. 1301], contains no such reminder." (*Rosales*, *supra*, 222 Cal.App.4th at pp. 1260–1261; see *People v. Reyes* (2007) 151 Cal.App.4th 1491, 1498.)

We find *Rosales* persuasive. The instruction properly stated the corpus delicti rule and the law, and the challenged third paragraph merely informed the jury that, in contrast with the commission of a crime, the identity of the defendant may be proved by defendant's statements alone. Immediately following that sentence, the jury was instructed, "You may not convict the defendant unless the People have proved his guilt beyond a reasonable doubt." The jury was so instructed on more than one occasion. We do not agree with defendants that the corpus delicti instruction was confusing. There is no reasonable likelihood the jury construed the corpus delicti instruction in a manner that violated defendants' rights, and we need not reach their prejudice argument. (*People v. Rogers* (2006) 39 Cal.4th 826, 872.)

(Doc. No. 11-2 at 2388-92 (footnotes omitted)).

### 1.  Federal Habeas Analysis

Petitioner argues the state court's decision was unreasonable because it "placed

1    dispositive reliance on the fact that a defendant's out of court statements can be used to prove

2    identity" but the "narrower claim here is that where a defendant's statements are insufficient to

3    prove identity beyond a reasonable doubt, instructing jurors they may rely on the defendant's

4    'statements alone' to infer identity gives jurors an impermissible shortcut to conviction and

5    undercuts the state's burden of proof."  (Doc. No. 1 at 42).  Additionally, Petitioner argues that by

6    focusing "on the fact that identity may be established by a defendant's statements alone," the

7    court "failed to consider the critical question of whether the statements *here* were sufficient to

8    prove identity."  (*Id.* at 43).

9         Respondent argues this claim is defaulted due to Petitioner's failure to object to the

10   instruction at trial but, even if not defaulted, the claim lacks merit.  (Doc. No. 12 at 31).

11   Respondent argues that the jury is presumed to understand its instructions and considering the

12   instructions as a whole, the jury was properly instructed that Petitioner could not be found guilty

13   absent proof beyond a reasonable doubt.  (*Id.* at 31-33).  Further, Respondent argues Petitioner

14   "does not realistically confront the task to affirmatively show prejudice," as required to succeed

15   on his claim.  (*Id.* at 33).

16        Petitioner replies that the failure to object does not bar federal habeas review of this claim

17   because "the default imposed was not independent of federal law."  (Doc. No. 15 at 12).  As to

18   the merits, Petitioner argues that the specific instruction indicating the state could prove identity

19   through the statements alone undercut the state's burden of proof despite the more general

20   instruction regarding proof beyond a reasonable doubt because "there were no other instructions

21   which explained the 'infirm language.'"  (*Id.* at 13-14 (citing *Francis v. Franklin*, 471 U.S. 307,

22   319 (1985)).  As to prejudice, Petitioner argues that there is a "reasonable likelihood" the jury

23   misunderstood and misapplied the instructions such that the error is structural and requires

24   reversal without a showing of prejudice.  (*Id.* at 14).

25        After completion of the initial briefing, Respondent filed a notice of supplemental

26   authority, alerting the Court to the unpublished Ninth Circuit decision in *Cai v. McDowell*, No.

27   22-16636, 2024 WL 937228 (9th Cir. Mar. 5, 2024), which rejected "the same counseled attack

28   on CALCRIM No. 359 (as to accused's identity and his statements)."  (Doc. No. 17).

1          The Court need not determine whether Petitioner's claim is defaulted because it fails

2   on the merits regardless.  "The Due Process Clause of the Fourteenth Amendment denies

3   States the power to deprive the accused of liberty unless the prosecution proves beyond a

4   reasonable doubt every element of the charged offense. Jury instructions relieving States of

5   this burden violate a defendant's due process rights."  *Martinez v. Garcia*, 379 F.3d 1034,

6   1038 (9th Cir. 2004) (citation modified) (quoting *Carella v. California*, 491 U.S. 263, 265

7   (1989)).  "But not every ambiguity, inconsistency, or deficiency in a jury instruction rises to

8   the level of a due process violation."  *Dixon v. Williams*, 750 F.3d 1027, 1033 (9th Cir.

9   2014).  "The constitutional question … is whether there is a reasonable likelihood that the

10  jury understood the instructions to allow conviction based on proof insufficient to meet the

11  *Winship* standard."  *Victor v. Nebraska*, 511 U.S. 1, 6 (1994).  The challenged instructions

12  "may not be judged in artificial isolation, but must be viewed in the context of the overall

13  charge."  *Dixon*, 750 F.3d at 1033.

14          While the Ninth Circuit's *Cai* opinion is not precedent, it is persuasive on this issue.

15  There, the Ninth Circuit concluded that a habeas petitioner was not entitled to relief based on

16  the use of the same jury instruction because "[t]he challenged instruction … simply states the

17  rule in California that identity *may* be proven by a defendant's statements alone, not that it

18  *must*" and while there was no dispute that the petitioner's "statements alone were insufficient

19  to establish his guilt beyond a reasonable doubt," the petitioner offered "no evidence that the

20  jury misunderstood CALCRIM No. 359 and came to its verdict based on his statements

21  alone."  *Cai*, 2024 WL 937228, at *2.  Further, the Ninth Circuit concluded that even if an

22  error occurred, it was harmless because "[c]onsidering the weight of the evidence against

23  Cai, it was reasonable to conclude that any error caused by CALCRIM No. 359 did not

24  necessarily render the trial fundamentally unfair."  *Id.* (citation modified).

25          The same analysis applies here.  The state appellate court concluded there was no

26  reasonable likelihood that the jury construed the instruction in a manner that lowered the

27  prosecution's burden of proof because it "merely informed the jury that … the identify of the

28  defendant may be proved by defendant's statements alone" but "[i]mmediately following that

1    sentence, the jury was instructed, 'You may not convict the defendant unless the People have

2    proved his guilt beyond a reasonable doubt.'"  (Doc. No. 11-2 at 2392; *see id.* at 1629).

3    Petitioner argues the Court must presume the jurors followed the instruction that they *could*

4    rely on his statements alone without pointing to evidence that the jurors *actually* relied on his

5    statements alone to prove his identity.  (Doc. No. 1 at 40-41).  Petitioner further argues the

6    error here was structural because it affected the burden of proof such that automatic reversal

7    is required.  (Doc. No. 1 at 41).  However, because the jury charge here was ambiguous at

8    best rather than erroneous, the reasonable likelihood standard applies.  *See Dixon*, 750 F.3d

9    at 1033 (explaining that the "reasonable likelihood inquiry does not apply when the disputed

10   instruction is erroneous rather than ambiguous").  Petitioner fails to show a reasonable

11   likelihood that the jury applied the instructions in a manner that violated the Constitution.

12        Further, as discussed above, there was sufficient evidence—none of which included

13   Petitioner's statements—from which the jury could conclude that Petitioner killed the victim.

14   Accordingly, even if an error occurred, such error was harmless.  *See Dixon*, 750 F.3d at

15   1034 ("Even where constitutional error is found, in § 2254 proceedings a court must also

16   assess the prejudicial impact of constitutional error under the *Brecht* standard.") (citation

17   modified).

18        Ultimately, Petitioner has failed to show that the appellate court's denial of this claim

19   was contrary to, or an unreasonable application of, clearly established federal law, or that the

20   appellate court's decision was based on an unreasonable determination of the facts.

21   Accordingly, the undersigned recommends that ground two be denied.

22        **C.    Ground Three-Instructional Error (Manslaughter)**

23        In ground three, Petitioner argues the failure to instruct the jury on the defense theory of

24   manslaughter violated his right to due process.  (Doc. No. 1 at 44).

25            **1. State Court Decision**

26        The appellate court rejected Petitioner's instructional error claim based on the failure to

27   include a manslaughter instruction, explaining:

28

1

### 1. Standard of Review

Voluntary and involuntary manslaughter are lesser included offenses of murder. (*People v. Thomas* (2012) 53 Cal.4th 771, 813.) Even in the absence of a request, the trial court has an obligation to instruct on a lesser included offense if substantial evidence would support a jury verdict that the defendant was guilty only of the lesser included offense and not the greater offense. (*People v. Gonzalez* (2018) 5 Cal.5th 186, 196; *People v. Romero* (2008) 44 Cal.4th 386, 402–403.) Substantial evidence is evidence from which a jury of reasonable people could conclude that the lesser offense, but not the greater, was committed. (*People v. Romero*, *supra*, at p. 403; *People v. Breverman* (1998) 19 Cal.4th 142, 162.) "Even evidence that is unconvincing or subject to justifiable suspicion may constitute substantial evidence and may trigger the lesser- included-offense requirement." (*People v. Vasquez* (2018) 30 Cal.App.5th 786, 792 (*Vasquez*).) Yet substantial evidence does not equate to "'*any* evidence, no matter how weak'" (*People v. Breverman*, *supra*, at p. 162); accord, see *People v. Simon* (2016) 1 Cal.5th 98, 132 ["Speculative, minimal, or insubstantial evidence is insufficient to require an instruction on a lesser included offense."]). The duty to instruct on lesser included offenses is an issue of state law, not one of federal constitutional law in noncapital cases. (*People v. Gonzalez*, *supra*, at p. 198.)

We review the trial court's failure to instruct on a lesser included offense de novo. (*People v. Brothers* (2015) 236 Cal.App.4th 24, 30; *Vasquez*, *supra*, 30 Cal.App.5th at p. 793.) In doing so, we consider the evidence in the light most favorable to defendants. (*People v. Brothers*, *supra*, at p. 30.) We do not evaluate witness credibility, and we resolve "uncertainty about whether the evidence is sufficient to warrant instructions" in defendants' favor. (*Vasquez*, *supra*, at p. 792.)

### 2. Analysis

Manslaughter is "the unlawful killing of a human being without malice." (§ 192.) "Accordingly, an instruction on involuntary manslaughter is required whenever there is substantial evidence indicating the defendant acted without conscious disregard for human life and did not form the intent to kill." (*Vasquez*, *supra*, 30 Cal.App.5th at p. 794, fn. omitted.)

Defendants argue there was substantial evidence of a lack of malice that supported an instruction on involuntary manslaughter. Specifically, defendants point to the fact it was a ricochet bullet that struck the victim, and no other bullets made contact with anyone. From this, defendants argue there was a basis to draw an inference Brown never fired the weapon at anyone—that perhaps he just fired the weapon at the ground or fired the weapon to scare the victim. There was no eyewitness to the shooting itself and no evidence whether the gun was aimed at the victim when it was fired, particularly in light of the fatal shot being a ricochet.

The People dispute there was substantial evidence to warrant an

1   instruction on involuntary manslaughter. Brown traveled to the
    Ashwood apartment complex with a loaded firearm and fired six
2   times before fleeing the scene. At a minimum, Brown's act of firing
    the weapon six times showed a conscious disregard for human
3   life—implied malice.

4   Defendants respond that even if Brown fired the weapon, there is
    substantial evidence he had no "intent to kill" in doing so. Yet, the
5   absence of an intent to kill does not show an absence of any malice.
    "Malice is implied when an unlawful killing results from a willful
6   act, the natural and probable consequences of which are dangerous
    to human life, performed with conscious disregard for that danger."
7   (*People v. Elmore* (2014) 59 Cal.4th 121, 133.) "[T]he state of mind
    of a person who acts with conscious disregard for life[, i.e., implied
8   malice,] is, 'I know my conduct is dangerous to others, but I don't
    care if someone is hurt or killed.'" (*People v. Olivas* (1985) 172
9   Cal.App.3d 984, 988.)

10  Defendants' reliance on *People v. Wilson* (1967) 66 Cal.2d 749 is
    unavailing. After discovering men were visiting at his estranged
11  wife's apartment, the defendant took a shotgun, forcibly entered her
    apartment, and killed her and another man. (*Id.* at pp. 752–753.) His
12  testimony at trial was that he did not enter the apartment with any
    intent to kill, only to scare, which was supported by other evidence.
13  (*Id.* at p. 756.) Based on this, there was evidence his use of the
    weapon was only a misdemeanor, the felony-murder rule was not
14  applicable, and the court noted the jury could find an absence of
    malice. (*Id.* at pp. 757–758.) There is no similar evidence here that
15  points to an absence of any malice.

16  Brown fired a .38-caliber semiautomatic weapon six times in the
    courtyard of an occupied apartment complex. Four bullets hit the
17  laundry room wall at approximately two to four feet above the
    ground, evidence they were fired at human height. Several of the
18  bullets went through the laundry room wall and could have struck
    someone inside the laundry room; one bullet traveled to the east
19  parking lot, and the other bullet hit the victim. There is no evidence
    to support an inference any of the bullets were fired at the ground or
20  that they were fired only to scare the victim; and the risk of
    ricochets or a stray shot was obvious.
21
22  Even if a reasonable jury could conclude Brown did not exhibit an
    intent to kill by firing the gun the way he did, there was no evidence
    from which the jury could infer Brown acted without implied
23  malice to warrant in involuntary manslaughter instruction. The trial
    court did not err in failing to instruct on involuntary manslaughter.
24

25  (Doc. No. 11-2 at 2379-82).

26         **2. Federal Habeas Analysis**

27         Petitioner argues the trial court's failure to instruct the jury on manslaughter deprived him

28  of an opportunity to fairly present his defense. (Doc. No. 1 at 46-47). He further argues this error

1    was not harmless because there was sufficient evidence that would have supported a finding of

2    manslaughter if the jury were given the instruction.  (*Id.* at 49-50).  Petitioner asserts § 2254(d)

3    does not bar relief on this claim because "the appellate court's focus on the sufficiency of

4    evidence to prove implied malice -- a finding which jurors did not make – should have had no

5    place in the analysis."  (Doc. No. 1 at 51).  Further, Petitioner argues the appellate court failed to

6    consider critical facts, including "(1) the prosecutor's concession at trial that he could not prove

7    what Mr. Brown was shooting at, (2) the absence of any evidence showing that petitioner knew

8    Mr. Correia and had a reason or intended to kill him or (3) the absence of any evidence showing

9    that petitioner had any motive to kill Mr. Corriea."  (*Id.* at 52).

10    Respondent argues the state appellate court reasonably rejected Petitioner's challenge to

11    the lack of a manslaughter conviction because there is no constitutional right to a lesser included

12    instruction in a noncapital case.  (Doc. No. 12 at 33-34).

13    Petitioner replies that Respondent's argument addresses the standard of § 2254(d) but

14    Petitioner "has already explained why § 2254(d) does not bar relief in this case, and why de novo

15    review is proper – in rejecting the claim on appeal, the state appellate court relied on facts which

16    were irrelevant to the claim and ignored facts which were plainly relevant."  (Doc. No. 15 at 16).

17    Petitioner argues that on de novo review, courts in the Ninth Circuit have recognized a right to

18    have instructions on defendant's theory of defense when such is supported by the evidence.  (*Id.*

19    at 16-17 (citing *Conde v. Henry*, 198 F.3d 734 (9th Cir. 2000))).

20    Petitioner has failed to raise a cognizable federal claim.  While the Supreme Court has

21    held the failure of a state court to instruct on a lesser included offense in a capital murder case is

22    error if there was evidence to support a lesser included offense instruction, the Supreme Court

23    reserved judgment as to "whether the Due Process Clause would require the giving of such

24    instructions in a noncapital case."  *Beck v. Alabama*, 447 U.S. 635, 638 n.14 (1980); *see also*

25    *Keeble v. United States*, 412 U.S. 205, 213 (1973) (The Supreme Court has "never explicitly held

26    that the Due Process Clause of the Fifth Amendment guarantees the right of a defendant to have

27    the jury instructed on a lesser included offense").  Additionally, the Ninth Circuit has made clear

28    that "the failure of a state trial court to instruct on lesser included offenses in a non-capital case

1  does not present a federal constitutional question."  *Windham v. Merkle*, 163 F.3d 1092, 1106 (9th

2  Cir. 1998); *Solis v. Garcia*, 219 F.3d 922, 929 (9th Cir. 2000) (per curiam).  In fact, in rejecting

3  Petitioner's challenge on appeal, the state appellate court explicitly noted that "the duty to instruct

4  on lesser included offenses is an issue of state law, not one of federal constitutional law in

5  noncapital cases."  (Doc. No. 11-2 at 2380).

6         Petitioner's attempt to recharacterize his claim as a denial of the opportunity to present a

7  complete defense fairs no better.  While in *Mathews v. United States*, the Supreme Court

8  recognized, as a matter of criminal procedure, that "a defendant is entitled to an instruction as to

9  any recognized defense for which there exists evidence sufficient for a reasonable jury to find in

10  his favor," 485 U.S. 58, 63 (1988), it similarly has held that such "meaningful opportunity to

11  present a complete defense" does not speak to "restrictions imposed on a defendant's ability to

12  present an affirmative defense."  *Gilmore v. Taylor*, 508 U.S. 333, 343 (1993).  Because no

13  clearly established Federal law exists to support the proposition that Petitioner's right to a

14  complete defense includes the right to a jury instruction, relief is unavailable under AEDPA.

15  *Wright v. Van Patten*, 552 U.S. 120, 126 (2008) (where Supreme Court "cases give no clear

16  answer to the question presented … it cannot be said that the state court 'unreasonably applied

17  clearly established Federal law'") (citation modified) (quoting *Carey v. Musladin*, 549 U.S. 70,

18  77 (2006)).

19         However, even if a constitutional right applied, Petitioner recognizes that he would only

20  be entitled to an instruction "on his theory of defense *when supported by the evidence*."  (Doc.

21  No. 1 at 47 (emphasis added)).  Here, the appellate court rejected Petitioner's argument that the

22  evidence supported a manslaughter instruction because there was no evidence to support that

23  Petitioner acted without, at a minimum, implied malice.  (Doc. No. 11-2 at 2381-82).  Contrary to

24  Petitioner's argument, the state court's discussion of implied malice was not irrelevant to whether

25  the evidence supported a manslaughter instruction.  In California, manslaughter "is the unlawful

26  killing of a human being *without malice*" while murder "is the unlawful killing of a human being,

27  or a fetus, with malice aforethought."  Cal. Penal Code §§ 187, 192 (emphasis added).  In other

28  words, a killing committed with *any* malice, whether express or implied, is murder rather than

1  manslaughter.  Malice is express "when there is manifested a deliberate intention to unlawfully

2  take away the life of a fellow creature" and malice is implied "when no considerable provocation

3  appears, or when the circumstances attending the killing show an abandoned and malignant

4  heart."  Cal. Penal Code § 188.  The state appellate court reasonably concluded that the

5  evidence—including that Petitioner fired a "semiautomatic weapon six times in the courtyard of

6  an occupied apartment complex," with four bullets hitting the laundry room wall at approximately

7  two to four feet above the ground or "at human height"—supported a showing of *at least* implied

8  malice in support of murder rather than manslaughter.  (Doc. No. 11-2 at 2381-82).

9       Finally, Petitioner cannot show that any error had a substantial and injurious effect on the

10  verdict.  The jury was instructed that if they "decide that a defendant committed murder, it is

11  murder of the second degree" unless the prosecution proved "that he acted willfully, deliberately,

12  and with premedication. The defendant acted willfully if he intended to kill."  (Doc. No. 11-2 at

13  1637-38).  The jury found Petitioner guilty of first, rather than second, degree murder, indicating

14  they found he acted with the intent to kill.  (*See* Doc. No. 11-1 at 838, 841).  Thus, the jury

15  completely rejected the idea that Petitioner did not act with an intent to kill.  In light of this

16  finding, there is no reason to believe an instruction of manslaughter would have impacted the

17  verdict.

18       Based on the foregoing, Petitioner cannot show that the state court's rejection of this claim

19  was contrary to, or an unreasonable application of, clearly established Supreme Court precedent,

20  nor that it was based on an unreasonable determination of the facts.  The undersigned

21  recommends that ground three be denied.

### D.    Ground Four-Cumulative Error

23       In his final ground, Petitioner argues that even if the individual errors do not warrant

24  habeas relief, the combined errors deprived him of a fair trial and warrant relief.  (Doc. No. 1 at

25  53).

26       "Cumulative error applies where, although no single trial error examined in isolation is

27  sufficiently prejudicial to warrant reversal, the cumulative effect of multiple errors [has] still

28  prejudice[d] a defendant."  *Cook v. Kernan*, 801 F. App'x 474, 477 (9th Cir. 2020) (internal

1   quotations and citations omitted).  The cumulative error, however, "must render the trial and

2   sentencing fundamentally unfair." *Id.* (citations omitted).  Absent a finding of any error on any of

3   the proceeding grounds, the Court cannot find cumulative error.  *Williams v. Filson*, 908 F.3d

4   546, 570 (9th Cir. 2018) (a court "cannot consider the cumulative effect of *non*-errors"); *see also*

5   *McGill v. Shinn*, 16 F.4th 666, 684 (9th Cir. 2021).

6       Because the undersigned finds none of Petitioner's preceding claims have merit, the

7   undersigned concludes Petitioner cannot show his conviction was fundamentally unfair nor a

8   "unique symmetry" of harmless errors that "amplify each other in relation to a key contested issue

9   in the case." *Ybarra v. McDaniel*, 656 F.3d 984, 1001 (9th Cir. 2011).  Thus, ground four is

10  without merit and should be denied.

11          **V.  CERTIFICATE OF APPEALABILITY**

12      A petitioner seeking a writ of habeas corpus has no absolute right to appeal a district

13  court's denial of a petition; he may appeal only in limited circumstances.  *See* 28 U.S.C. § 2253;

14  *Miller-El v. Cockrell*, 537 U.S. 322, 335-36 (2003).  Rule 11 Governing § 2254 Cases requires a

15  district court to issue or deny a certificate of appealability when entering a final order adverse to a

16  petitioner.  *See also* Ninth Circuit Rule 22-1(a); *United States v. Asrar*, 116 F.3d 1268, 1270 (9th

17  Cir. 1997).  A certificate of appealability will not issue unless a petitioner makes "a substantial

18  showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2).  This standard requires

19  the petitioner to show that "jurists of reason could disagree with the district court's resolution of

20  his constitutional claims or that jurists could conclude the issues presented are adequate to

21  deserve encouragement to proceed further."  *Miller-El*, 537 U.S. at 327; *accord Slack v.*

22  *McDaniel*, 529 U.S. 473, 484 (2000).  Because Petitioner has not made a substantial showing of

23  the denial of a constitutional right, the undersigned recommends that the court decline to issue a

24  certificate of appealability.

25      Accordingly, it is **RECOMMENDED**:

26      1.  Petitioner be DENIED all relief on his Petition for Writ of Habeas Corpus (Doc. No.

27          1); and

28      2.  Petitioner be denied a certificate of appealability.

1

**NOTICE TO PARTIES**

2     These Findings and Recommendations will be submitted to the United States District

3 Judge assigned to this case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within 14 days

4 after being served with a copy of these Findings and Recommendations, a party may file written

5 objections with the Court.  *Id.*; Local Rule 304(b).  The document should be captioned,

6 "Objections to Magistrate Judge's Findings and Recommendations" and shall not exceed **fifteen**

7 **(15) pages**.  The Court will not consider exhibits attached to the Objections.  To the extent a party

8 wishes to refer to any exhibit(s), the party should reference the exhibit in the record by its

9 CM/ECF document and page number, when possible, or otherwise reference the exhibit with

10 specificity.  Any pages filed in excess of the fifteen (15) page limitation may be disregarded by

11 the District Judge when reviewing these Findings and Recommendations under 28 U.S.C. §

12 636(b)(l)(C).  A party's failure to file any objections within the specified time may result in the

13 waiver of certain rights on appeal.  *Wilkerson v. Wheeler*, 772 F.3d 834, 839 (9th Cir. 2014).

14

15 Dated:    October 15, 2025

16 HELENA M. BARCH-KUCHTA
UNITED STATES MAGISTRATE JUDGE

17

18

19

20

21

22

23

24

25

26

27

28

45